**EXHIBIT E**

No. 05-2032, 05-2033, 05-2034 (Consolidated)

# In the
# United States Court of Appeals
## *for the*
# Third Circuit

In re OAKWOOD HOMES CORPORATION *et al.*

*Debtors.*

JPMORGAN CHASE BANK, TRUSTEE (No. 05-2033),
AND APPEALING B-2 HOLDERS JEFFERSON PILOT CORPORATION, TYNDALL
PARTNERS, LP, TYNDALL INSTITUTIONAL PARTNERS, LP (No. 05-2032), ACADEMY LIFE
INSURANCE COMPANY, LIFE INVESTORS INSURANCE COMPANY OF AMERICA,
MONUMENTAL LIFE INSURANCE COMPANY, PEOPLE'S BENEFIT LIFE INSURANCE
COMPANY, AND TRANSAMERICA LIFE INSURANCE COMPANY (No. 05-2034),

*Appellants,*

-against-

U.S. BANK NATIONAL ASSOCIATION, as INDENTURE TRUSTEE,

*Appellee.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT
OF DELAWARE CONSOLIDATED CASES 04-CV-835, 836, 837, 838, 839

## BRIEF OF APPELLANTS

RICHARDS, LAYTON & FINGER, P.A.
Russell C. Silberglied
Jason M. Madron
One Rodney Square, P.O. Box 551
Wilmington, DE 19899
Telephone: (302) 651-7700
Facsimile: (302) 651-7701

STITES & HARBISON, PLLC
Robert C. Goodrich, Jr.
Alex P. Herrington, Jr.
Madison L. Cashman
SunTrust Center, Suite 1800
424 Church Street
Nashville, TN 37219
Telephone: (615) 244-5200
Facsimile: (615) 742-2146

BINGHAM McCUTCHEN LLP
G. Eric Brunstad, Jr.
*Counsel of Record*
Timothy B. DeSieno
Rheba Rutkowski
One State Street
Hartford, CT 06103
Telephone: (860) 240-2700
Facsimile: (860) 240-2818

SEWARD & KISSEL LLP
M. William Munno
John J. Galban
One Battery Park Plaza
New York, NY 10004
Telephone: (212) 574-1200
Facsimile: (212) 480-8421

*COUNSEL TO APPELLANTS*

RLF1-2890139-1

# RULE 26.1 CORPORATE DISCLOSURE STATEMENTS

# United States Court of Appeals for the Third Circuit

## Corporate Disclosure Statement and
## Statement of Financial Interest

No. 05-0032

Jefferson-Pilot Life Insurance Company, et al.

v.

US Bank National Association, As Trustee

### Instructions

Pursuant to Rule 26.1, Federal Rules of Appellate Procedure any nongovernmental corporate party to a proceeding before this Court must file a statement identifying all of its parent corporations and listing any publicly held company that owns 10% or more of the party's stock.

Third Circuit LAR 26.1(b) requires that every party to an appeal must identify on the Corporate Disclosure Statement required by Rule 26.1, Federal Rules of Appellate Procedure, every publicly owned corporation not a party to the appeal, if any, that has a financial interest in the outcome of the litigation and the nature of that interest. This information need be provided only if a party has something to report under that section of the LAR.

In all bankruptcy appeals counsel for the debtor or trustee of the bankruptcy estate shall provide a list identifying: 1) the debtor if not named in the caption; 2) the members of the creditors' committee or the top 20 unsecured creditors; and, 3) any entity not named in the caption which is an active participant in the bankruptcy proceedings. If the debtor or the bankruptcy estate is not a party to the proceedings before this Court, the appellant must file this list. LAR 26.1(c).

The purpose of collecting the information in the Corporate Disclosure and Financial Interest Statements is to provide the judges with information about any conflicts of interest which would prevent them from hearing the case.

The completed Corporate Disclosure Statement and Statement of Financial Interest Form must, if required, must be filed upon the filing of a motion, response, petition or answer in this Court, or upon the filing of the party's principal brief, whichever occurs first. An original and three copies must be filed. A copy of the statement must also be included in the party's principal brief before the table of contents regardless of whether the statement has previously been filed. Rule 26.1(b) and (c), Federal Rules of Appellate Procedure.

If additional space is needed, please attach a new page.

(Page 1 of 2)

Pursuant to Rule 26.1 and Third Circuit LAR 26.1, <u>Jefferson-Pilot Life Insurance</u> Company, makes the following disclosure:  Jefferson Pilot    (Name of Party) Financial Insurance Company, Tyndall Partners, LP, and Tyndall Institutional Partners, LP    1) For non-governmental corporate parties please list all parent corporations:  Jefferson-Pilot Corporation, a publicly held company, owns all of Jefferson-Pilot Life Insurance Company and 80.3% of Jefferson Pilot Financial Insurance Company.
    2) For non-governmental corporate parties please list all publicly held companies that hold 10% or more of the party's stock: Jefferson-Pilot Corporation, a publicly held company, owns all of Jefferson-Pilot Life Insurance Company and 80.3% of Jefferson Pilot Financial Insurance Company.

    3) If there is a publicly held corporation which is not a party to the proceeding before this Court but which has as a financial interest in the outcome of the proceeding, please identify all such parties and specify the nature of the financial interest or interests:

    4) In all bankruptcy appeals counsel for the debtor or trustee of the bankruptcy estate must list: 1) the debtor, if not identified in the case caption; 2) the members of the creditors' committee or the top 20 unsecured creditors; and, 3) any entity not named in the caption which is active participant in the bankruptcy proceeding. If the debtor or trustee is not participating in the appeal, this information must be provided by appellant.

        SEE ATTACHED

(Signature of Counsel or Party)        Dated: April 13, 2005

## DISCLOSURE STATEMENT RE: OAKWOOD HOMES BANKRUPTCY

The Oakwood Homes Corporation Liquidation Trust (the "Trust") has provided the following disclosure, pursuant to Rule 26.1 of the Federal Rules of Appellate Procedures and Rule 26.1.1(c) of the Third Circuit Local Appellate Rules:

(1)    The Debtors were the following entities:  Oakwood Homes Corporation, New Dimension Homes, Inc., Dream Street Company, LLC, Oakwood Shared Services, LLC, HBOS Manufacturing LP, Oakwood MHD4, LLC, Oakwood Acceptance Corporation, LLC, Oakwood Mobile Homes, Inc., Suburban Home Sales, Inc., FSI Financial Services, Inc., Home Service Contract, Inc,. Tri-State Insurance Agency, Inc., Golden West Leasing, LLC, Crest Capital, LLC and Preferred Housing Services, LP.  Pursuant to a joint plan of reorganization (the "Plan") which was confirmed on March 31, 2004 and became effective on April 15, 2004 (the "Effective Date"), the Trust was created and vested with substantially all of the assets of the Debtors' chapter 11 estates and administrative responsibilities in their chapter 11 cases.

(2)    The members of the Official Committee of Unsecured Creditors (the "Committee") were as follows:  JP Morgan Chase Bank (as Trustee for holders of certain REMIC certificates), U.S. Bank National Association (as Indenture Trustee for holders of certain Senior Notes), Absolute Recovery Hedge Funds, Ltd., Aegon USA Investment Management, LLC, Patrick Industries, Inc., Carriage Industries, Inc., LaSalle Bristol LLP and D.E. Shaw & Co., *ex officio member*.  The Committee was disbanded on the Effective Date.

(3)    Other active participants in the proceeding:  The Trust is charged with making distributions to holders of all allowed claims in the chapter 11 cases, pursuant to the terms of the Plan.  This Plan provides that all administrative, priority, and secured creditors are entitled to receive full cash payment from the Trust and the Trust has made or will have the resources to make such distributions regardless of the Court's decision.  Thus, such creditors do not have a direct stake in this appeal.  The Plan also provides that unsecured creditors receive, on a *pro rata* basis, beneficial interests in the Trust, entitling them to the remainderman's interest in the Trust's

corpus (after satisfaction of the Trust's expenses). Thus, all of the Debtors' unsecured creditors have a considerable interest in the outcome of this appeal. The largest holder of Trust beneficial interests (i.e., the largest unsecured creditor of the Debtors) is Berkshire Hathaway, Inc. The former members of the Committee also are large holders of Trust beneficial interests.

United States Court of Appeals for the Third Circuit

## Corporate Disclosure Statement and
## Statement of Financial Interest

No. 05-8033

JP Morgan Chase Bank, As Trustee

v.

US Bank National Association, As Trustee

### Instructions

Pursuant to Rule 26.1, Federal Rules of Appellate Procedure any nongovernmental corporate party to a proceeding before this Court must file a statement identifying all of its parent corporations and listing any publicly held company that owns 10% or more of the party's stock.

Third Circuit LAR 26.1(b) requires that every party to an appeal must identify on the Corporate Disclosure Statement required by Rule 26.1, Federal Rules of Appellate Procedure, every publicly owned corporation not a party to the appeal, if any, that has a financial interest in the outcome of the litigation and the nature of that interest. This information need be provided only if a party has something to report under that section of the LAR.

In all bankruptcy appeals counsel for the debtor or trustee of the bankruptcy estate shall provide a list identifying: 1) the debtor if not named in the caption; 2) the members of the creditors' committee or the top 20 unsecured creditors; and, 3) any entity not named in the caption which is an active participant in the bankruptcy proceedings. If the debtor or the bankruptcy estate is not a party to the proceedings before this Court, the appellant must file this list. LAR 26.1(c).

The purpose of collecting the information in the Corporate Disclosure and Financial Interest Statements is to provide the judges with information about any conflicts of interest which would prevent them from hearing the case.

The completed Corporate Disclosure Statement and Statement of Financial Interest Form must, if required, must be filed upon the filing of a motion, response, petition or answer in this Court, or upon the filing of the party's principal brief, whichever occurs first. An original and three copies must be filed. A copy of the statement must also be included in the party's principal brief before the table of contents regardless of whether the statement has previously been filed. Rule 26.1(b) and (c), Federal Rules of Appellate Procedure.

If additional space is needed, please attach a new page.

(Page 1 of 2)

Pursuant to Rule 26.1 and Third Circuit LAR 26.1, ___JP Morgan Chase Bank, As Trustee___
makes the following disclosure:                              (Name of Party)

    1) For non-governmental corporate parties please list all parent corporations:

       JP Morgan Chase & Co. is the parent of JP Morgan Chase Bank, Appellant

    2) For non-governmental corporate parties please list all publicly held companies that hold 10% or more of the party's stock:

       No publicly held company holds more than 10% of the stock of JP Morgan Chase Bank

    3) If there is a publicly held corporation which is not a party to the proceeding before this Court but which has as a financial interest in the outcome of the proceeding, please identify all such parties and specify the nature of the financial interest or interests:

    4) In all bankruptcy appeals counsel for the debtor or trustee of the bankruptcy estate must list: 1) the debtor, if not identified in the case caption; 2) the members of the creditors' committee or the top 20 unsecured creditors; and, 3) any entity not named in the caption which is active participant in the bankruptcy proceeding. If the debtor or trustee is not participating in the appeal, this information must be provided by appellant.

       SEE ATTACHED

_(Signature of Counsel or Party)_             Dated: _April 13, 2005_

## DISCLOSURE STATEMENT RE: OAKWOOD HOMES BANKRUPTCY

The Oakwood Homes Corporation Liquidation Trust (the "Trust") has provided the following disclosure, pursuant to Rule 26.1 of the Federal Rules of Appellate Procedures and Rule 26.1.1(c) of the Third Circuit Local Appellate Rules:

(1)    The Debtors were the following entities:  Oakwood Homes Corporation, New Dimension Homes, Inc., Dream Street Company, LLC, Oakwood Shared Services, LLC, HBOS Manufacturing LP, Oakwood MHD4, LLC, Oakwood Acceptance Corporation, LLC, Oakwood Mobile Homes, Inc., Suburban Home Sales, Inc., FSI Financial Services, Inc., Home Service Contract, Inc,. Tri-State Insurance Agency, Inc., Golden West Leasing, LLC, Crest Capital, LLC and Preferred Housing Services, LP.  Pursuant to a joint plan of reorganization (the "Plan") which was confirmed on March 31, 2004 and became effective on April 15, 2004 (the "Effective Date"), the Trust was created and vested with substantially all of the assets of the Debtors' chapter 11 estates and administrative responsibilities in their chapter 11 cases.

(2)    The members of the Official Committee of Unsecured Creditors (the "Committee") were as follows:  JP Morgan Chase Bank (as Trustee for holders of certain REMIC certificates), U.S. Bank National Association (as Indenture Trustee for holders of certain Senior Notes), Absolute Recovery Hedge Funds, Ltd., Aegon USA Investment Management, LLC, Patrick Industries, Inc., Carriage Industries, Inc., LaSalle Bristol LLP and D.E. Shaw & Co., *ex officio member*.  The Committee was disbanded on the Effective Date.

(3)    Other active participants in the proceeding:  The Trust is charged with making distributions to holders of all allowed claims in the chapter 11 cases, pursuant to the terms of the Plan.  This Plan provides that all administrative, priority, and secured creditors are entitled to receive full cash payment from the Trust and the Trust has made or will have the resources to make such distributions regardless of the Court's decision.  Thus, such creditors do not have a direct stake in this appeal.  The Plan also provides that unsecured creditors receive, on a *pro rata* basis, beneficial interests in the Trust, entitling them to the remainderman's interest in the Trust's

corpus (after satisfaction of the Trust's expenses). Thus, all of the Debtors' unsecured creditors have a considerable interest in the outcome of this appeal. The largest holder of Trust beneficial interests (i.e., the largest unsecured creditor of the Debtors) is Berkshire Hathaway, Inc. The former members of the Committee also are large holders of Trust beneficial interests.

## United States Court of Appeals for the Third Circuit

## Corporate Disclosure Statement and
## Statement of Financial Interest

No.  05-2034

Academy Life Insurance Company, Life Investors Insurance Company of America, Monumental Life Insurance Company, Peoples Benefit Life Insurance Company, and Transamerica Life Insurance Company,  Appellants

v.

U.S. Bank National Association, as Indenture Trustee,  Appellee

### Instructions

Pursuant to Rule 26.1, Federal Rules of Appellate Procedure any nongovernmental corporate party to a proceeding before this Court must file a statement identifying all of its parent corporations and listing any publicly held company that owns 10% or more of the party's stock.

Third Circuit LAR 26.1(b) requires that every party to an appeal must identify on the Corporate Disclosure Statement required by Rule 26.1, Federal Rules of Appellate Procedure, every publicly owned corporation not a party to the appeal, if any, that has a financial interest in the outcome of the litigation and the nature of that interest. This information need be provided only if a party has something to report under that section of the LAR.

In all bankruptcy appeals counsel for the debtor or trustee of the bankruptcy estate shall provide a list identifying: 1) the debtor if not named in the caption; 2) the members of the creditors' committee or the top 20 unsecured creditors; and, 3) any entity not named in the caption which is an active participant in the bankruptcy proceedings. If the debtor or the bankruptcy estate is not a party to the proceedings before this Court, the appellant must file this list. LAR 26.1(c).

The purpose of collecting the information in the Corporate Disclosure and Financial Interest Statements is to provide the judges with information about any conflicts of interest which would prevent them from hearing the case.

The completed Corporate Disclosure Statement and Statement of Financial Interest Form must, if required, must be filed upon the filing of a motion, response, petition or answer in this Court, or upon the filing of the party's principal brief, whichever occurs first. An original and three copies must be filed. A copy of the statement must also be included in the party's principal brief before the table of contents regardless of whether the statement has previously been filed. Rule 26.1(b) and (c), Federal Rules of Appellate Procedure.

If additional space is needed, please attach a new page.

(Page 1 of 2)

ACADEMY LIFE INSURANCE COMPANY

Pursuant to Rule 26.1 and Third Circuit LAR 26.1, _____
makes the following disclosure:

(Name of Party)

1) For non-governmental corporate parties please list all parent corporations: Academy Insurance Group, Inc., owned by Commonwealth General Corp., owned by AEGON U.S. Corporation, owned by AEGON U.S. Holding Corporation, owned by Transamerica Corporation, owned by The AEGON Trust, owned by AEGON International N.V., owned by AEGON N.V. (a publicly traded company in the U.S.)

2) For non-governmental corporate parties please list all publicly held companies that hold 10% or more of the party's stock:

Not applicable - AEGON N.V., the only publicly traded company in the AEGON group, does not directly own 10% or more of Academy stock.

3) If there is a publicly held corporation which is not a party to the proceeding before this Court but which has as a financial interest in the outcome of the proceeding, please identify all such parties and specify the nature of the financial interest or interests:

AEGON N.V. - See Response 1, above

4) In all bankruptcy appeals counsel for the debtor or trustee of the bankruptcy estate must list: 1) the debtor, if not identified in the case caption; 2) the members of the creditors' committee or the top 20 unsecured creditors; and, 3) any entity not named in the caption which is active participant in the bankruptcy proceeding. If the debtor or trustee is not participating in the appeal, this information must be provided by appellant.

SEE ATTACHED

_____
(Signature of Counsel or Party)

Dated: _4/14/05_

Pursuant to Rule 26.1 and Third Circuit LAR 26.1, makes the following disclosure:

LIFE INVESTORS INSURANCE
COMPANY OF AMERICA
<u>                                        </u>
(Name of Party)

    1) For non-governmental corporate parties please list all parent corporations:  AEGON USA, Inc., owned by AEGON U.S. Corporation, owned by AEGON U.S. Holding Corporation, owned by Transamerica Corporation, owned by The AEGON Trust, owned by AEGON International N.V., owned by AEGON N.V. (a publicly traded company in the U.S.)

    2) For non-governmental corporate parties please list all publicly held companies that hold 10% or more of the party's stock:

Not applicable - AEGON N.V., the only publicly traded company in the AEGON group, does not directly own 10% or more of Life Investor stock.

    3) If there is a publicly held corporation which is not a party to the proceeding before this Court but which has as a financial interest in the outcome of the proceeding, please identify all such parties and specify the nature of the financial interest or interests:

AEGON N.V.  - See Response to 1, above

    4) In all bankruptcy appeals counsel for the debtor or trustee of the bankruptcy estate must list: 1) the debtor, if not identified in the case caption; 2) the members of the creditors' committee or the top 20 unsecured creditors; and, 3) any entity not named in the caption which is active participant in the bankruptcy proceeding. If the debtor or trustee is not participating in the appeal, this information must be provided by appellant.

SEE ATTACHED

_____
(Signature of Counsel or Party)

Dated: _4/14/05_

Pursuant to Rule 26.1 and Third Circuit LAR 26.1, <u>MONUMENTAL LIFE INSURANCE COMPANY</u>
makes the following disclosure: (Name of Party)

     1) For non-governmental corporate parties please list all parent
corporations: Capital General Development Corporation, owned by Commonwealth
General Corporation, owned by AEGON U.S. Corporation, owned by AEGON U.S.
Holding Corporation, owned by Transamerica Corporation, owned by The AEGON
Trust, owned by AEGON International N.V., owned by AEGON N.V. (a publicly traded
     2) For non-governmental corporate parties please list all publicly held company in US)
companies that hold 10% or more of the party's stock:

Not applicable - AEGON N.V., the only publicly traded company in the AEGON
group, does not directly own 10% or more of Monumental Life stock.

     3) If there is a publicly held corporation which is not a party to the
proceeding before this Court but which has as a financial interest in the outcome of the
proceeding, please identify all such parties and specify the nature of the financial
interest or interests:

AEGON N.V. - See Response to 1, above

     4) In all bankruptcy appeals counsel for the debtor or trustee of the
bankruptcy estate must list: 1) the debtor, if not identified in the case caption; 2) the
members of the creditors' committee or the top 20 unsecured creditors; and, 3) any
entity not named in the caption which is active participant in the bankruptcy proceeding.
If the debtor or trustee is not participating in the appeal, this information must be
provided by appellant.

SEE ATTACHED

_____    Dated: _4/14/05_
(Signature of Counsel or Party)

Pursuant to Rule 26.1 and Third Circuit LAR 26.1,     PEOPLES BENEFIT LIFE INSURANCE COMPANY
makes the following disclosure:                                  (Name of Party)

       1) For non-governmental corporate parties please list all parent
corporations: Monumental Life Insurance Co., owned by Capital General Development Corp.,
owned by Commonwealth General Corp., owned by AEGON U.S. Corp., owned by AEGON
U.S. Holding Corp., owned by Transamerica Corp., owned by The AEGON Trust, owned
by AEGON International N.V., owned by AEGON N.V. (a publicly traded company in U.S.)

       2) For non-governmental corporate parties please list all publicly held
companies that hold 10% or more of the party's stock:

Not applicable - AEGON N.V., THE ONLY PUBLICLY TRADED COMPany in the AEGON group,
does not directly own 10% or more of People Benefit stock.

       3) If there is a publicly held corporation which is not a party to the
proceeding before this Court but which has as a financial interest in the outcome of the
proceeding, please identify all such parties and specify the nature of the financial
interest or interests:

AEGON N.V. - See Response to 1, above

       4) In all bankruptcy appeals counsel for the debtor or trustee of the
bankruptcy estate must list: 1) the debtor, if not identified in the case caption; 2) the
members of the creditors' committee or the top 20 unsecured creditors; and, 3) any
entity not named in the caption which is active participant in the bankruptcy proceeding.
If the debtor or trustee is not participating in the appeal, this information must be
provided by appellant.

SEE ATTACHED

_R. ht C. Goodman_                                    Dated: _4/14/05_
(Signature of Counsel or Party)

rev: 12/1998                              (Page 2 of 2)

Pursuant to Rule 26.1 and Third Circuit LAR 26.1,   TRANSAMERICA LIFE INSURANCE COMPANY
makes the following disclosure:                            _____
                                                                   (Name of Party)

      1) For non-governmental corporate parties please list all parent
corporations: AEGON USA, Inc., owned by AEGON U.S. Corporation, owned by AEGON
U.S. Holding Corporation, owned by Transamerica Corporation, owned by The AEGON
Trust, owned by AEGON International N.V., owned by AEGON N.V. (a publicly traded
company in the U.S.)
      2) For non-governmental corporate parties please list all publicly held
companies that hold 10% or more of the party's stock:

Not applicable - AEGON N.V., the only publicly traded company in the AEGON group,
does not directly own 10% or more of Transamerica Life Insurance stock.

      3) If there is a publicly held corporation which is not a party to the
proceeding before this Court but which has as a financial interest in the outcome of the
proceeding, please identify all such parties and specify the nature of the financial
interest or interests:

AEGON N.V. - See Response 1, above

      4) In all bankruptcy appeals counsel for the debtor or trustee of the
bankruptcy estate must list: 1) the debtor, if not identified in the case caption; 2) the
members of the creditors' committee or the top 20 unsecured creditors; and, 3) any
entity not named in the caption which is active participant in the bankruptcy proceeding.
If the debtor or trustee is not participating in the appeal, this information must be
provided by appellant.

SEE ATTACHED


_____        Dated: __4/14/05__
(Signature of Counsel or Party)

UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT

CORPORATE DISCLOSURE STATEMENT
AND STATEMENT OF FINANCIAL INTEREST

No. 05-2034

4.    In all bankruptcy appeals counsel for the [appellant] must list:

(1)    The Debtors were the following entities:  Oakwood Homes Corporation, New Dimension Homes, Inc., Dream Street Company, LLC, Oakwood Shared Services, LLC, HBOS Manufacturing LP, Oakwood MHD4, LLC, Oakwood Acceptance Corporation, LLC, Oakwood Mobile Homes, Inc., Suburban Home Sales, Inc., FSI Financial Services, Inc., Home Service Contract, Inc,. Tri-State Insurance Agency, Inc., Golden West Leasing, LLC, Crest Capital, LLC and Preferred Housing Services, LP.

Pursuant to a joint plan of reorganization (the "Plan") which was confirmed on March 31, 2004, and became effective on April 15, 2004 (the "Effective Date"), the Trust was created and vested with substantially all of the assets of the Debtors' chapter 11 estates and administrative responsibilities in their chapter 11 cases.

(2)    The members of the Official Committee of Unsecured Creditors (the "Committee") were as follows:  JP Morgan Chase Bank (as Trustee for holders of certain REMIC certificates), U.S. Bank National Association (as Indenture Trustee for holders of certain Senior Notes), Absolute Recovery Hedge Funds, Ltd., AEGON USA Investment Management, LLC, Patrick Industries, Inc., Carriage Industries, Inc., LaSalle Bristol LLP, and D.E. Shaw & Co., *ex officio member.*

The Committee was disbanded on the Effective Date.

(3)    Other active participants in the proceeding:  The Trust is charged with making distributions to holders of all allowed claims in the chapter 11 cases, pursuant to the terms of the Plan.  This Plan provides that all administrative, priority, and secured creditors are entitled to receive full cash payment from the Trust and the Trust has made or will have the resources to make such distributions regardless of the Court's decision.  Thus, such creditors do not have a direct stake in this appeal.

The Plan also provides that unsecured creditors receive, on a *pro rata* basis, beneficial interests in the Trust, entitling them to the remainderman's interest in the Trust's corpus (after satisfaction of the Trust's expenses).  Thus, all of the Debtors' unsecured creditors have a considerable interest in the outcome of this appeal.

The largest holder of Trust beneficial interests (i.e., the largest unsecured creditor of the Debtors) is Berkshire Hathaway, Inc.  The former members of the Committee also are large holders of Trust beneficial interests.

CA156:CA679:621094:1:NASHVILLE
4/13/05

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ...............................................................................1

JURISDICTION .................................................................................................2

STATEMENT OF ISSUES ....................................................................................2

STATEMENT OF RELATED PROCEEDINGS ..........................................................2

STATEMENT OF THE CASE..................................................................................3

    A.    Background....................................................................................3

        1.    The securitization transactions..................................3

        2.    Appellants' Advances, the B-2 Certificates, and the Limited Guarantees...............................................4

        3.    The Guarantees and Oakwood's obligations ...................6

    B.    Appellants' Claims.........................................................................7

        1.    The components of Appellants' Claims...........................8

        2.    Appellants' proofs of claim .............................................9

        3.    The Claims Objections....................................................9

        4.    The Claims Orders .........................................................10

    C.    Oakwood's Plan and Scheduled Distributions..............................11

    D.    The District Court's Resolution Of The Claims Orders Appeal................11

STANDARD OF REVIEW ....................................................................................12

SUMMARY OF ARGUMENT ...............................................................................13

ARGUMENT......................................................................................................16

    A.    The Bankruptcy Court Erred As A Matter of Law In Ruling That Section 502(b) Requires That Principal Shortfalls Due Under The Guarantees Must Be Discounted To Present Value Because This Ruling Contravenes The Express Terms Of The Bankruptcy Code..........16

        1.    Appellants' Principal Claims constitute "claims" in the amount of $95.5 million under the plain text of section 101(5)............................................................................17

        2.    Appellants' Principal Claims must be allowed in the full amount of $95.5 million under the plain text of section 502(b)............................................................................19

        3.    Section 502(b)'s instruction to determine the "amount" of a claim "as of the date of the filing of the petition" is simply an instruction to determine the debtor's liabilities as of the petition date and does not authorize the discounting of an obligation ...................................................................21

B.  The Claims Orders Are Contrary To The Text And Structure Of The Bankruptcy Code As A Whole ...........................................................23

1.  When Congress intends discounting under the Code, it uses language distinctly different from the text of section 502(b), and Congress did not intend section 502(b) to authorize discounting .......................................................................23

2.  The bankruptcy court's ruling that section 502(b) directs the discounting of clams renders section 502(b)(2) superfluous ...............................................................................26

3.  The bankruptcy court's discounting rule would exact unfair penalties on creditors subject to other provisions of section 502(b) such as section 502(b)(6)..................................................27

C.  The Claims Orders Are Contrary To The History Behind Section 502(b), The Legislative History To The Provision, And The Historical Treatment Of Guaranty Claims In Bankruptcy Cases...............28

1.  The Claims Orders are contrary to the prior practice under the predecessors to section 502.......................................................29

2.  The Claims Orders contravene the legislative history to section 502(b)...........................................................................31

3.  The Claims Orders contravene over a century of settled bankruptcy law concerning the treatment of guaranty claims ...........................................................................................31

D.  The Bankruptcy Court Has No Authority To Create A Novel Claims-Adjustment Procedure By Directing  The Discounting Of Appellants' Principal Claims .................................................................34

E.  The Bankruptcy Court's Ruling Directing The Discounting Of Appellants' Principal Claims Is Contrary To The Fundamental Bankruptcy Policy of Equality Of Distribution ........................................35

F.  The Bankruptcy Court's Construction Of Section 502(b) Burdens Unnecessarily The Administration of Bankruptcy Cases .........................36

G.  The Bankruptcy Court's Discounting Rule Creates A Perverse Incentive For Guarantors To Escape Their Guaranty Obligations ...........37

H.  The Bankruptcy Court's Discounting Rule Is Inequitable And Generates A Windfall For Other Creditors Such as US Bank ................38

I.  The Bankruptcy Court's Prior Decision In *Loewen* Is Both Distinguishable And Inapposite ................................................................39

J.  The Claims Orders Are Not Supported By The Doctrine Of "Original Issue Discount" ..........................................................................42

CONCLUSION ..............................................................................................44

APPENDIX VOLUME I

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Airline Pilots Ass'n v. Continental Airlines (In re Continental Airlines)*, 125 F.3d 20 (3d Cir. 1997) ........................................................................................12

*Associates Commercial Corp. v. Rash*, 520 U.S. 953 (1997) ............................24

*Astoria Fed. Sav. & Loan Ass'n v. Solimino*, 501 U.S. 104 (1991) ....................26

*In re Automobile Int'l Refrigeration*, 275 B.R. 789 (Bankr. N.D. Tex. 2002) ................20

*Bates v. United States*, 522 U.S. 23 (1997) ........................................................25

*Board of Comm'rs v. Hurley*, 169 F. 92 (8th Cir. 1909) ................................32, 33

*Butner v. United States*, 440 U.S. 48 (1979) ......................................................38

*Chemical Bank v. First Trust (In re Southeast Banking Corp.)*, 156 F.3d 1114 (11th Cir. 1998) ..................................................................................35

*Cohen v. De La Cruz*, 523 U.S. 213 (1998) ..................................................18, 28

*Connecticut Nat'l Bank v. Germain*, 503 U.S. 249 (1992) ................................17

*Dewsnup v. Timm*, 502 U.S. 410 (1992) ........................................................28, 38

*Duparquet Huot & Moneuse Co. v. Evans*, 297 U.S. 216 (1936) ..................23, 28

*FCC v. NextWave Personal Communications, Inc.*, 537 U.S. 293 (2003) ..................17, 25

*In re F.W.D.C., Inc.*, 158 B.R. 523 (Bankr. S.D. Fla. 1993) ..............................33

*Gas Power Mach. v. Wisconsin Trust Co. (In re Wisconsin Engine Co.)*, 234 F. 281 (7th Cir. 1916) ......................................................................................42

*Grupo Mexicano de Desarrollo v. Alliance Bond Fund*, 527 U.S. 308 (1999) ................34

*Hartford Underwriters Ins. Co. v. Union Planters Bank*, 530 U.S. 1 (2000) ................17

*Ireton v. Lincoln Nat'l Bank*, 300 F. 316 (6th Cir. 1924) ................................33

*Ivanhoe Bldg. & Loan Ass'n v. Orr*, 295 U.S. 243 (1935) ..............................33

*Johns v. Rousseau Mortgage Corp. (In re Johns)*, 37 F.3d 1021 (3d Cir. 1994) ................7

*Johnson v. Home State Bank*, 501 U.S. 78 (1991)..........................................................17, 25

*Kawaauhau v. Geiger*, 523 U.S. 57 (1998).................................................................27

*Kelly v. Robinson*, 479 U.S. 36 (1986) ...................................................................23

*Kucin v. Devan*, 251 B.R. 269 (D. Md. 2000) ...............................................................41

*LTV Corp. v. Valley Fid. Bank & Trust Co. (In re Chateaugay Corp.)*, 961 F.2d
    378 (2d Cir. 1992)....................................................................................38, 41

*Lamie v. United States Trustee*, 540 U.S. 526 (2004)...........................................17, 28, 31

*In re Loewen Group, Int'l*, 274 B.R. 427
    (Bankr. D. Del. 2002) ...........................................................................12, 39, 40, 41, 42

*In re Manville Forest Prods. Corp.*, 43 B.R. 293 (Bankr. S.D.N.Y. 1984).......................21

*Merrill v. National Bank of Jacksonville*, 173 U.S. 131, 141 (1899) ...............................32

*Midlantic Nat'l Bank v. New Jersey Dep't of Envtl. Prot.*, 474 U.S. 494 (1986)..............28

*Minority Equity Capital Corp. v. Weinstein (In re Weinstein)*, 31 B.R. 804
    (Bankr. E.D.N.Y. 1983) .............................................................................................6

*In re Mitchell*, 85 B.R. 564 (D. Nev. 1988) ................................................................20

*In re Moffat*, 107 B.R. 255 (Bankr. C.D. Cal. 1989) .........................................................19

*NLRB v. Bildisco & Bildisco*, 465 U.S. 513 (1984).....................................................25, 37

*In re New York Rys. Corp.*, 82 F.2d 739 (2d Cir. 1936) ..................................................30

*Norwest Bank Worthington v. Ahlers*, 485 U.S. 197 (1988) ...........................................34

*In re O.P.M. Leasing Servs., Inc.*, 79 B.R. 161 (S.D.N.Y. 1987)......................................42

*Ohio v. Kovacs*, 469 U.S. 274 (1985) .........................................................................25

*In re Orne*, 18 F. Cas. 10,581 (S.D.N.Y. 1867)............................................................30

*PBGC v. Belfance (In re CSC Indus., Inc.)*, 232 F.3d 505 (6th Cir. 2000).......................41

*PBGC v. CF&I Fabricators of Utah, Inc. (In re CF&I Fabricators of Utah, Inc.)*,
    150 F.3d 1293 (10th Cir. 1998) ..................................................................................41

*In re Payless Cashways, Inc.*, 287 B.R. 482 (Bankr. W.D. Mo. 2002) .............................20

*Pennsylvania Dep't of Pub. Welfare v. Davenport*, 495 U.S. 552 (1990) .............18, 25, 28

*In re Pharmadyne Labs., Inc.*, 53 B.R. 517 (Bankr. D.N.J. 1985) .......................................8

*Rake v. Wade*, 508 U.S. 464 (1993) .............................................................................24, 27

*In re Realty Assoc. Sec. Corp.*, 66 F. Supp. 416 (E.D.N.Y. 1946) ....................................33

*Security Nat'l Bank v. Gessin (In re Gessin)*, 668 F.2d 1105 (9th Cir. 1982) ..................33

*Sexton v. Dreyfus*, 219 U.S. 339 (1911) ..........................................................................22

*In re Sharon Steel Corp.*, 871 F.2d 1217 (3d Cir. 1989) ...................................................13

*In re Southern Cinemas, Inc.*, 256 B.R. 520 (Bankr. M.D. Fla. 2000) ..............................18

*St. Louis Southwestern R. Co. v. Dickerson*, 470 U.S. 409 (1985).....................................26

*Stillwater Nat'l Bank & Trust Co. v. Kirtley (In re Solomon)*, 299 B.R. 626 (10th Cir. BAP 2003) .................................................................................................................18

*Sunbeam-Oster Co. v. Lincoln Liberty Ave., Inc. (In re Allegheny Int'l, Inc.)*, 145 B.R. 823 (W.D. Pa. 1992)...........................................................................................28

*Taylor v. AGE Fed. Credit Union (In re Taylor)*, 3 F.3d 1512 (11th Cir. 1993)...............38

*Texas Commerce Bank, N.A. v. Licht (In re Pengo Indus., Inc.)*, 962 F.2d 543 (5th Cir. 1992) .................................................................................................22, 43, 44

*In re Thomson McKinnon Sec., Inc.*, 149 B.R. 61 (Bankr. S.D.N.Y. 1992) ......................41

*Till v. SCS Credit Corp.*, 541 U.S. 465 (2004)(B) .......................................................24, 25

*Toibb v. Radloff*, 501 U.S. 157 (1991)...............................................................................25

*Union Bank v. Wolas*, 502 U.S. 151 (1991)......................................................................35

*United Sav. Ass'n v. Timbers of Inwood Forest Assocs., Ltd.*, 484 U.S. 365 (1988) ........23

*United States v. Locke*, 471 U.S. 84 (1985)......................................................................34

*United States v. Marxen*, 307 U.S. 200 (1939) ...........................................................21, 22

*United States v. Noland*, 517 U.S. 535 (1996) ................................................................34

*United States v. Reorganized CF&I Fabricators of Utah, Inc.*, 518 U.S. 213 (1996) ................................................................................................................28, 34

*United States v. Ron Pair Enters., Inc.*, 489 U.S. 235 (1989) ......................17, 23

*Universal Minerals, Inc. v. C. A. Hughes & Co.*, 669 F.2d 98 (3d Cir. 1981) ..................12

*Vaillancourt v. Marlow (In re Vaillancourt)*, 197 B.R. 464 (Bankr. M.D. Pa. 1996) ..........................................................................................................................8

*Vanston Bondholders Protective Comm. v. Green*, 329 U.S. 156 (1946) ........22, 26, 35, 37

*Young v. Higbee*, 324 U.S. 204 (1945) ................................................................35

## UNPUBLISHED CASES

*LTV Steel Co. v. Aetna Cas. & Sur. Co. (In re Chateaugay Corp.)*, No. 94 CIV. 1257 (LMM), 1996 WL 346010 (S.D.N.Y. June 24, 1996) ..................................38, 41

*Nationwide Mut. Ins. Co. v. Optel Inc. (In re Optel Inc.)*, No. 02-2121, 60 Fed. Appx. 390, 2003 U.S. App. LEXIS 5783 (3d Cir. March 25, 2003) ....................20, 21

## FEDERAL STATUTES AND RULES

11 U.S.C. § 101(10) ................................................................................................7

11 U.S.C. § 101(5) ................................................................................................17

11 U.S.C. § 101(5) ..................................................................................................7

11 U.S.C. § 103(a) ..................................................................................................7

11 U.S.C. § 501(a) ..................................................................................................7

11 U.S.C. § 502(a) ..................................................................................................7

11 U.S.C. § 502(b) .........................................................................................7, 8, 14

11 U.S.C. § 541(a) ..................................................................................................7

11 U.S.C. § 1129(a)(9)(A) .....................................................................................25

11 U.S.C. § 1325(a)(5)(B)(ii) ................................................................................14

28 U.S.C. § 158, 1291 & 1292 .................................................................................2

28 U.S.C. § 1291 & 1292 .........................................................................................2

28 U.S.C. § 1292 ......................................................................................................2

29 U.S.C. § 1362(b)(1)(B) ......................................................................................41

Act of 1867, ch. 176, 14 Stat. 517 (1867) (repealed 1878)...................................30

H.R. Rep. No. 95-595 (1977), *reprinted in* 1978 U.S.C.C.A.N.
    6266...............................................................................18, 24, 37, 22, 31, 44

S. Rep. No. 989 (1978), *reprinted in* 1978 U.S.C.C.A.N. at 5848 ..............31, 44

Bankruptcy Act of 1898, 11 U.S.C. § 103 .............................................................29

Fed. R. Bankr. P. 3003 ..............................................................................................7

## MISCELLANEOUS

*The New Palgrave Dictionary of Money & Finance* ..............................................26

*Felix Frankfurter, Some Reflections on the Reading of Statutes,* 47 Colum. L.
    Rev. 527 (1947) ............................................................................................23

Sumner N. Levine, *Financial Analysts' Handbook I* (1975) ................................26

Black's Law Dictionary (2d Pocket Ed.) (West 2001) ..........................................19

Collier on Bankruptcy (14th Ed. 1972).................................................................29

## PRELIMINARY STATEMENT

These consolidated appeals arise out of the Chapter 11 bankruptcy case of debtor Oakwood Homes Corporation ("**Oakwood**"). The appellants are JPMorgan Chase Bank, as indenture trustee ("**JPMorgan**"), and a group of creditors[1] that advanced approximately $95.5 million to certain third-party, non-debtor trusts that Oakwood created (collectively, "**Appellants**"). In exchange for these advances, the trusts issued interest-bearing certificates to Appellants, obligating the trusts to repay the advances plus interest over time. Oakwood guaranteed the trusts' principal and interest obligations to Appellants. Appellee U.S. Bank National Association ("**US Bank**") is a creditor that objected to Appellants' guaranty claims in the bankruptcy court.

In a series of orders (the "**Claims Orders**"), the bankruptcy court allowed a portion of Appellants' guaranty claims against Oakwood, but directed that the *principal* amount of Appellants' guaranty claims must be "discounted to present value" -- thereby reducing the aggregate principal amount from $95.5 million to $25.3 million -- on the ground that Oakwood was obligated to make principal payments to Appellants in installments over time. The issue on appeal is whether

---

[1]The appealing creditors are Jefferson Pilot Life Insurance Company, Jefferson Pilot Financial Insurance Company, Tyndall Partners, LP, Tyndall Institutional Partners, LP, Academy Life Insurance Company, Life Investors Insurance Company of America, Monumental Life Insurance Company, People's Benefit Life Insurance Company, and Transamerica Life Insurance Company, and the creditors themselves. JP Morgan serves as indenture trustee on behalf of the other Appellants and did not itself advance any funds to acquire any certificates. The relationship among Appellants is explained *infra*. The notice of appeal docketed as Case No. 05-2032 erroneously named "Jefferson Pilot Corporation" as an appellant. The correct Jefferson Pilot entities are Jefferson Pilot Life Insurance Company and Jefferson Pilot Financial Insurance Company. A motion to amend the caption to correct this error is pending.

the bankruptcy court properly "discounted to present value" the principal amount of Appellants' claims.

## JURISDICTION

Appellants timely appealed the Claims Orders on May 17, 2004, *see* Appendix ("**App.**") 621-31, and the district court's final order affirming the Claims Orders on March 24, 2005, *see* App. 1-25. This Court has jurisdiction pursuant to 28 U.S.C. §§ 158, 1291 & 1292.

## STATEMENT OF ISSUES

1.    Whether the bankruptcy court erred in entering the Claims Orders directing the discounting to present value of the principal amount of Appellants' Claims.    [Appellee's Claims Objections (Bankruptcy Docket ("**B.D.I.**") 2108, 2455, 3648, 3712); Appellant's Responses (B.D.I. 2324, 3372, 3375, 3702); Transcripts (App. 126-27 (Nov. 26, 2003 Hrg. Trans. 44-45); App. 152-57 (Jan. 23, 2004 Hrg. Trans. 9-14); Claims Orders ("**CO**") (App. 578-620; in particular, App. 581, 586, 591, 596, 601 (CO ¶ 3)].

2.    Whether the district court erred in affirming the Claims Orders. [Appellants' briefs (District Court docket ("**D.I.**") 19, 34); Appellee's brief (D.I. 33); Order and Memorandum (App. 26, 27-33)].

## STATEMENT OF RELATED PROCEEDINGS

This Court previously considered Appellants' Emergency Motion for Stay Pending Appeal and for Expedited Consideration, No. 04-3277.

## STATEMENT OF THE CASE

### A.    Background

#### 1.    The securitization transactions

Oakwood commenced its Chapter 11 case on November 15, 2003 (the
"**Petition Date**"). Prior to filing for bankruptcy, Oakwood was in the business of
designing, manufacturing, and selling modular homes to consumers. App. 579
(CO 2). As part of its business, Oakwood operated several wholly owned
subsidiaries, including Oakwood Acceptance Corporation, LLC ("**OAC**") and
Oakwood Mortgage Investors, Inc. ("**OMI**"). *Id.*

OAC was in the business of financing the purchases of Oakwood's homes.
App. 579 (CO 2). To purchase a home on credit, a consumer would execute a
retail installment contract ("**RIC**"). Under the terms of the RIC, the consumer
agreed to pay the purchase price for the home in installments over a period of up to
thirty years. B.D.I. 627 (February 18, 2003 Disclosure Statement ("**DS**"), Ex. D
14). OMI "securitized" these RICs. Specifically, OMI bundled together groups of
RICs and sold them to certain real estate mortgage investment conduit
securitization trusts ("**REMIC trusts**"). OMI created the REMIC trusts
specifically for the purpose of buying the RICs that OAC generated. The
securitization process allowed Oakwood to "cash out" the value of the bundled
RICs by selling them to the REMIC trusts, thereby converting the consumers'
long-term payment obligations into current cash. *Id.*, 18-19; App. 579-80 (CO 2-
3).

OMI established each REMIC trust under the terms of a pooling and
servicing agreement entered into by OMI, OAC, and a trustee for each trust
("**Pooling Agreement**"). OMI created the REMIC trusts in series during the
course of several years and labeled them accordingly. For example, "OMI Trust

1997-A" refers to the first REMIC trust of the series that OMI created in 1997. As a result of the sale of the RICs to the REMIC trusts, the trusts became the owners of the RICs and thus became entitled to receive the installment payments that the consumers were obligated to make under the RICs. App. 50-51 (Pooling Agreement); App. 579 (CO 3); B.D.I. 627 (DS, Ex. D 19).

In order to pay for the RICs that they were purchasing, each REMIC trust borrowed money in the marketplace by issuing certificates to investors who, in exchange for the certificates, advanced money to the issuing trust. The certificates obligated the trust to repay the investors' cash advances by paying the investors principal and interest periodically over time. App. 579 (CO 3); B.D.I. 627 (DS, Ex. D 19).

Each REMIC trust issued certificates in various "tranches." The different tranches have different payment priorities, meaning that certain tranches of certificates have the right to be paid from the trust's assets ahead of others. To induce investors to advance funds in exchange for the certificates with the lowest payment priority (i.e., the riskiest certificates), Oakwood guaranteed principal and interest payments due investors (such as Appellants) who acquired these low-priority certificates. App. 130 (Muir Decl. ¶¶ 5-7); B.D.I. 627 (DS, Ex. D 19).

2.    **Appellants' advances, the B-2 Certificates, and the Limited Guarantees**

Appellants advanced approximately $95.5 million to purchase low-priority, interest-bearing certificates issued by eight REMIC trusts: OMI Trust 1997-A, OMI Trust 1997-B, OMI Trust 1997-C, OMI Trust 1997-D, OMI Trust 1998-B, OMI Trust 1998-D, OMI Trust 1999-A, and OMI Trust 1999-B (the "**Trusts**").[2]

---

[2] Appellants did not actually acquire their B-2 Certificates directly from the Trusts but at a discount from an underwriter that acquired them directly or indirectly from the Trusts.

These certificates (the "**B-2 Certificates**") have an aggregate "face" (principal) amount of approximately $98.7 million and require the Trusts to pay Appellants this amount as principal and an additional amount of interest.[3] Oakwood, in turn, guaranteed the payment of principal and interest to Appellants under the B-2 Certificates pursuant to certain Limited Guarantees (the "**Guarantees**"). App. 579 (CO 3); App. 44-48 (sample Guarantee). Each Trust issued its B-2 Certificates pursuant to a trust indenture agreement between the issuing Trust and an indenture trustee representing the certificate holders. Appellant JPMorgan is the indenture trustee with respect to the B-2 Certificates. The other Appellants are appealing creditors that hold the B-2 Certificates.

As the structure of the securitization transactions reveals, the parties contemplated that consumers who purchased homes on credit would make principal and interest payments due on their RICs to the Trusts (because the Trusts had purchased their RICs). In turn, the Trusts would pay principal and interest to the B-2 Certificates holders from amounts they received from the consumers. Both before and after Oakwood filed for bankruptcy, however, many consumers failed to make their installment payments under the RICs. Accordingly, the Trusts lacked the funds necessary to pay the principal and interest due to Appellants under

---

[3]The face amount of the B-2 Certificates is approximately $98.7 million, for which the appealing holders of the B-2 Certificates paid a total of approximately $95.5 million (approximately 89.8 to 99.9 cents for each dollar of face amount). App. 142 (Muir Decl., Ex. B) (showing prices paid for each series of B-2 Certificates). The face amount of the B-2 Certificates is greater than the purchase price paid by Appellants because the interest that the Trusts offered on the B-2 Certificates was inadequate to compensate for the risks associated with the certificates. Accordingly, the market discounted the price of the certificates to reflect this inadequacy at the time Appellants acquired their B-2 Certificates.

their B-2 Certificates. As a result, Oakwood became obligated to make up the shortfalls under its Guarantees.

### 3.    The Guarantees and Oakwood's obligations

Each Guarantee provides that Oakwood "hereby unconditionally and absolutely guarantees the full and prompt payment to the [trustee of the particular Trust] on or prior to the Remittance Date relating to each Distribution Date [the date the trustee is supposed to make periodic payments to Appellants under the B-2 Certificates] of the Limited Guarantee Amount (as defined in the Pooling Agreements)." App. 44 (sample Guarantee ¶ 1). The Pooling Agreements define the Limited Guarantee Amount as follows:

> "Limited Guarantee Payment Amount": With respect to any Distribution Date, the amount . . . equal to the amount of shortfalls in collections on the Assets [including the RICs] otherwise distributable on such Distribution Date . . . .

App. 57 (Pooling Agreement 9). Each Guarantee provides: "This is a guaranty of payment and not of collection." App. 45-46 (Guarantee ¶ 6). *See Minority Equity Capital Corp. v. Weinstein (In re Weinstein)*, 31 B.R. 804, 811-12 (Bankr. E.D.N.Y. 1983) (one who guarantees "payment" is absolutely liable to make payment upon default by the principal; one who guarantees "collection" incurs only a conditional liability after all attempts to obtain payment from the principal have failed); RESTATEMENT 3D OF SURETYSHIP & GUARANTY, § 15(b) (ALI 1996) ("guaranty of collection" triggers liability only after collection efforts have failed).

It is undisputed that: (1) the Guarantees require Oakwood to make up any shortfalls in amounts necessary to make the principal and interest payments to Appellants required under the B-2 Certificates; (2) the Trusts will not generate sufficient cash flows to make these payments; (3) as a result of past, current, and future shortfalls of principal and interest, Oakwood's obligations under the Guarantees have been and will continue to be triggered; and (4) Oakwood has not

honored its obligations under the Guarantees to fund the shortfalls. App. 44-48 (Guarantee); App. 573-74 (Stipulation ¶¶ 1-2); App. 137-40 (Muir Decl. ¶¶ 23-28); App. 632-38 (postpetition interest shortfalls).

## B.    Appellants' Claims

By operation of law, when a debtor such as Oakwood commences a bankruptcy case, a bankruptcy estate is created consisting of all of the debtor's property. 11 U.S.C. §§ 103(a) & 541(a). The Bankruptcy Code also provides that a debtor's monetary obligations to creditors constitute "claims" against the bankruptcy estate. 11 U.S.C. §§ 101(5) & 502(b). Creditors holding rights to payment against the debtor, whether due presently or in the future, are entitled to file a "proof of claim" with the bankruptcy court. 11 U.S.C. §§ 101(10) & 501(a); Fed. R. Bankr. P. 3003. Creditors filing proofs of claim may be entitled to distributions (to the extent available) from the bankruptcy estate. In general, only creditors that file proofs of claim are entitled to distributions, *see* Fed. R. Bankr. P. 3003(c)(2), and then only to the extent that their claims are "allowed," *see Johns v. Rousseau Mortgage Corp. (In re Johns)*, 37 F.3d 1021, 1023 n.1 (3d Cir. 1994) ("An 'allowed' claim is one that will serve as the basis for distribution.") (citing 11 U.S.C. § 502(a)).

A filed claim is "allowed" automatically if no party in interest objects. 11 U.S.C. § 502(a). If an objection to a claim is filed, however, the bankruptcy court must resolve the objection and either allow or disallow the claim under section 502(b). Specifically, section 502(b) directs that, if an objection to a claim has been filed, the court "shall determine the amount of such claim in lawful currency of the United States as of the date of the filing of the petition, except to the extent that [one of the exceptions to allowance listed in section 502(b) applies]." 11 U.S.C. § 502(b).

1.    The components of Appellants' Claims

For bankruptcy purposes, Appellants' guaranty claims against Oakwood (the "**Claims**") consist of three components:   (1) interest shortfalls accruing before Oakwood filed for bankruptcy; (2) interest shortfalls accruing after Oakwood filed for bankruptcy; and (3) principal shortfalls.

Under applicable bankruptcy law, claims for interest accruing before a debtor files for bankruptcy (i.e., claims for "**prepetition**" interest) are allowable. *Vaillancourt v. Marlow (In re Vaillancourt)*, 197 B.R. 464, 465-66 (Bankr. M.D. Pa. 1996). The bankruptcy court allowed the prepetition interest component of Appellants' Claims and this aspect of the Claims Orders is not at issue here. App. 573 (Stipulation ¶ 1). Under applicable bankruptcy law, a claim for interest accruing after a debtor files for bankruptcy (i.e., claims for "**postpetition**" interest) is disallowed to the extent that "such claim is for unmatured interest." 11 U.S.C. § 502(b)(2). "Unmatured" interest means postpetition interest that has not yet accrued (matured) at the time the debtor files for bankruptcy. *E.g., In re Pharmadyne Labs., Inc.*, 53 B.R. 517, 522 (Bankr. D.N.J. 1985). The bankruptcy court disallowed the postpetition interest component of Appellants' Claims and this aspect of the Claims Orders is not at issue here.

What is at issue in these appeals is the bankruptcy court's treatment of the principal component of Appellants' Claims -- i.e., the principal that Appellants advanced that the Trusts have not repaid and that Oakwood is obligated to pay under its Guarantees. Appellants' principal claims total approximately $95.5 million (the "**Principal Claims**"). Under applicable bankruptcy law, Appellants are entitled to assert the full $95.5 million of their Principal Claims against Oakwood and to receive a distribution from Oakwood's bankruptcy estate based on this amount.

### 2.    Appellants' proofs of claim

JPMorgan filed Amended Proofs of Claim with the bankruptcy court on behalf of the holders of the B-2 Certificates (including Appellants) for Oakwood's failure to satisfy its obligations under its Guarantees. *See* B.D.I. 8016-22. During the course of the bankruptcy proceedings, the parties stipulated to the amount of principal shortfalls arising under the Guarantees as follows:

| | |
|---|---|
| 1997-A | $4,087,372 |
| 1997-B | $7,415,899 |
| 1997-C | $11,731,441 |
| 1997-D | $10,096,367 |
| 1998-B | $15,000,000 |
| 1998-D | $25,554,561 |
| 1999-A | $24,591,125 |
| 1999-B | $17,894,150 |
| TOTAL | $116,370,915 |

App. 574 (Stipulation ¶ 2). The difference between the stipulated total of $116,370,915 and Appellants' Principal Claims in the amount of $95.5 million is that the stipulated amount includes principal shortfalls of B-2 Certificate holders that did not appeal from the Claims Orders.

### 3.    The Claims Objections

US Bank objected to Appellants' Claims in separate filings on October 10, 2003 and November 21, 2003 (the "**Claims Objections**"). US Bank is the indenture trustee for holders of certain unsecured notes issued by Oakwood. US Bank's motivation in filing its Claims Objections was to reduce the amount of Appellants' Claims so that it could recover a greater amount on its own claims -- i.e., the less Appellants receive, the more US Bank will receive.

As is relevant here, US Bank sought disallowance of Appellants' Claims to the extent that they included (1) postpetition interest shortfalls and (2) principal

shortfalls due in the future that were not discounted to present value at a maximum rate of 20%. JPMorgan, on behalf of the holders of B-2 Certificates, filed separate responses to the Claims Objections on November 6, 2003 and January 16, 2004.

### 4.    The Claims Orders

At a November 26, 2003 hearing, the bankruptcy court ruled that Appellants' claims for postpetition interest must be disallowed under section 502(b)(2). App. 126-27 (Nov. 26, 2003 Hrg. Trans. 44-45).

At a January 23, 2004 hearing, the bankruptcy court ruled that the Principal Claims must be "discounted to present value" on the theory that Oakwood was obligated to make principal payments in the future as each shortfall arose. App. 154 (Jan. 23, 2004 Hrg. Trans. 11). In so doing, the court rejected JPMorgan's argument that discounting the principal shortfalls to present value while at the same time disallowing the postpetition interest shortfalls constituted an impermissible "double discounting" of the Claims. App. 152-57 (Jan. 23, 2004 Hrg. Trans. 9-14). The bankruptcy court further determined that Appellants' Principal Claims would be discounted using the 7.74% prudent-investor rate proposed by JPMorgan and its expert, rather than the risk-adjusted rate proposed by US Bank and its expert. App. 160-63 (Jan. 23, 2004 Hrg. Trans. 17-20); App. 569 (March 12, 2004 Hrg. Trans. 104). Although Appellants contend that no discounting of principal is appropriate, the discount *rate* is not at issue here.

Using the discount rate of 7.74%, the $116,370,915 stipulated amount of principal shortfalls owed to all B-2 Certificate holders has a "present value" of $30,491,930. App. 574 (Stipulation ¶ 2). Using the same rate, Appellants' Principal Claims in the aggregate amount of $95.5 million have a "present value" of $25,337,168.

On May 6, 2004, the bankruptcy court entered its Claims Orders, granting in part, and denying, in part, the Claims Objections, and reflecting the rulings summarized above. App. 578-620 (Claims Orders).

## C.    Oakwood's Plan And Scheduled Distributions

Oakwood's Chapter 11 plan (the "**Plan**"), which was confirmed on April 16, 2004, provides for the creation of a liquidation trust (the "**Liquidation Trust**") to fund distributions to creditors, including JPMorgan on behalf of Appellants. As provided in the Plan, Oakwood sold its assets and operations to a third-party investor and the proceeds from this sale were placed in the Liquidation Trust to fund distributions to creditors. The Plan provides that unsecured creditors in Class 4, which includes JPMorgan, shall recover their *pro rata* share of assets in the Liquidation Trust available for distribution, estimated to be sufficient to yield a recovery of 37.4% on claims. App. 237-38 (Plan, Section 4.18).

Appellants contend that they are entitled to receive a distribution calculated on the basis of the full $95.5 million amount of their Principal Claims -- i.e., a distribution of $35,752,270.61 (37.4% of $95.5 million). As a result of the Claims Orders, however, Appellants' Principal Claims have been reduced to a mere $25,337,168 and Appellants are now scheduled to receive only $9,761,400 (37.4% of $25,337,168) -- a difference in recovery of over $26 million.

## D.    The District Court's Resolution Of The Claims Orders Appeals

Appellants timely appealed the Claims Orders to the district court, which issued a memorandum and order affirming the Claims Orders, entered on February 22, 2005 (the "**Order**"). The court ruled that the Claims Orders are supported by "a plain reading of section 502(b)" and that "section 502(b)'s language clearly and unambiguously required the bankruptcy court to both discount the [Principal

Claims] to present value and to exclude post-petition interest." App. 31-32 (Order 5-6).

According to the district court, this result is "not at odds with the overarching purposes of the Bankruptcy Code" because the B-2 Certificates "are certificates for future payments." App. 32 (Order 6). The court stated that the parties stipulated that principal payments arise in the future and that, "[i]n effect, the parties stipulated that the REMIC Trusts are not liable for the full principal upon filing, and thus the full principal is not accelerated." *Id.* On this basis, the court concluded that Oakwood, as the guarantor of the Trusts, "cannot be held liable for the full principal upon filing." App. 31-32 (Order 6-7).

Finally, the district court, while noting that the bankruptcy court did not state the basis for its Claims Orders, found persuasive a prior decision, *In re Loewen Group, Int'l*, 274 B.R. 427 (Bankr. D. Del. 2002), in which the same bankruptcy court concluded that section 502(b) requires that claims for principal be discounted to present value as of the petition date. App. 32 (Order 7). The district court rejected Appellants' argument that *Loewen* is distinguishable on its facts because the claims that were discounted to present value in that case were non-interest bearing. In so doing, the district court stated that it was "not persuaded that the distinction between interest-bearing and non-interest-bearing claims is significant to the issue at bar." *Id.*

## STANDARD OF REVIEW

This Court reviews questions of law *de novo*; questions of fact under the clearly erroneous standard; and decisions of the bankruptcy court with no deference to the district court's analysis. *Airline Pilots Ass'n v. Continental Airlines (In re Continental Airlines)*, 125 F.3d 120, 128 (3d Cir. 1997) ("Our review of the district court's determination is plenary. We exercise the same

review of the district court's decision as that exercised by the district court. The bankruptcy court's findings of fact are reviewable only for clear error. Legal determinations are subject to plenary review.") (citations omitted); *In re Sharon Steel Corp.*, 871 F.2d 1217, 1222 (3d Cir. 1989); *Universal Minerals, Inc. v. C. A. Hughes & Co.*, 669 F.2d 98, 101-02 (3d Cir. 1981). These appeals involve pure questions of law.

## SUMMARY OF ARGUMENT

The Claims Orders directing the discounting of the ***principal*** amount of Appellants' Claims are erroneous and must be reversed because they impose an unauthorized "double-discounting" penalty. As a result of the disallowance of the postpetition interest component of Appellants' Claims, Appellants are unable to recover any postpetition interest from Oakwood. The double-discounting penalty arises because, under the Claims Orders, Appellants are also unable to recover the vast majority of the $95.5 million in principal that they actually advanced to the Trusts and that the Trusts owe them under the B-2 Certificates. For distribution purposes, the Claims Orders treat Appellants as though they had advanced merely $25,337,168. The Plan gives them a 37.4% distribution on this reduced amount. This result is clearly wrong and the Claims Orders must be reversed.

First, the Claims Orders are contrary to the plain text of sections 101(5) and 502(b) of the Bankruptcy Code. Under section 101(5), the full amount of Appellants' Principal Claims constitutes a "claim" for bankruptcy purposes. In turn, section 502(b) directs that all "claims," as defined in section 101(5), must be allowed, except as section 502(b) otherwise provides. No provision of section 502 authorizes the reduction of the principal amount of a creditor's claim by "discounting to present value."

Second, the Claims Orders are contrary to the structure and text of the Bankruptcy Code as a whole. When Congress intends that a sum be discounted to present value, it says so expressly. For example, under section 1325(a)(5)(B)(ii) of the Code, the bankruptcy court is required to calculate the present value of future distributions to be made to a secured creditor under a debtor's Chapter 13 plan to ensure that the value of these future distributions is at least equal to the present value of the secured creditor's collateral. 11 U.S.C. § 1325(a)(5)(B)(ii) (requiring the court to calculate "the *value*, as of the effective date of the plan, of property to be distributed under the plan") (emphasis supplied). Section 502 does not contain the same authorization with respect to the determination of claims and merely provides that the court shall "determine the *amount* of such claim . . . as of the date of the filing of the petition." 11 U.S.C. § 502(b) (emphasis supplied). If Congress had intended the discounting of claims to present value pursuant to section 502(b), it would have said so, as it did in other sections. That Congress has authorized discounting to present value in other provisions, but not under section 502(b), demonstrates that Congress did not intend discounting under section 502(b).

The conclusion that section 502(b) does not authorize discounting is also supported by the fact that permitting discounting under section 502(b) would render superfluous section 502(b)(2), which disallows claims for unmatured (postpetition) interest. That is, if section 502(b) directed the discounting of claims, then section 502(b)(2) would be rendered superfluous because discounting claims to present value under section 502(b) would itself eliminate postpetition interest.

Third, the Claims Orders are contrary to the historical claims-allowance procedures specified in the statutory predecessors to section 502, which did not allow the discounting of the principal amount of an interest-bearing obligation. The legislative history to section 502(b) also demonstrates that section 502(b) does not authorize discounting. Moreover, the Claims Orders violate the rule, followed

by courts for over a century, that creditors such as Appellants are entitled to assert the full amount of their guaranty claims against bankrupt debtors.

Fourth, bankruptcy courts have no authority to engraft a discounting feature onto section 502(b) where Congress has not seen fit to provide one. It is for the legislature, not the courts, to specify whether and under what circumstances certain claims may be treated less favorably than others through such measures as discounting, and the bankruptcy court exceeded its authority in doing so here.

Fifth, the Claims Orders are contrary to the Bankruptcy Code's policy of equality of distribution. While other creditors will receive distributions calculated on the basis of the full, undiscounted amount of their claims, Appellants will receive a distribution based upon only a portion of their Principal Claims as a result of the discounting. In no sense is this "equality of distribution."

Sixth, if allowed to stand, the Claims Orders would burden unnecessarily the administration of bankruptcy cases. Every day creditors file claims in bankruptcy seeking to recover the principal amount owed to them, including principal amounts owed under loan agreements in which the debtor has agreed to make principal payments in installments over time. It is manifestly *not* the rule that, in order to determine the principal amount of a creditor's claim, bankruptcy courts must discount to present value the future stream of principal installments because doing so would greatly understate the creditor's actual outlay of capital. In addition, it would impose an unwarranted administrative burden by requiring courts to superintend the discounting process and consider potentially conflicting expert testimony on how discounting should be conducted (as happened here).

Seventh, the Claims Orders are inefficient because they create a perverse incentive for guarantors to file for bankruptcy in order to escape their guaranty obligations -- i.e., the Claims Orders encourage troubled debtors to file for bankruptcy to reduce the principal amount of their long-term guaranty obligations.

Finally, the Claims Orders are patently unfair. Appellants are out of pocket the full principal amount of their Claims. They are entitled to the same percentage recovery on their principal outlays as other creditors (here 37.4 %), and the Claims Orders generate an unjustified windfall for other creditors (such as US Bank) whose claims are not discounted and who thus receive proportionately more on their claims.

## ARGUMENT

**A.    The Bankruptcy Court Erred As a Matter of Law In Ruling That Section 502(b) Requires That Principal Shortfalls Due Under The Guarantees Must Be Discounted To Present Value Because This Ruling Contravenes The Express Terms Of The Bankruptcy Code.**

Neither US Bank nor the lower courts cited a single decision in which a court has discounted to present value the principal amount of an interest-bearing obligation. Nor could they, because doing so is contrary to the governing provisions of the Bankruptcy Code; constitutes an unlawful double-discounting penalty; and makes no sense. A simple example demonstrates the point:

Suppose that a bank lends a debtor $100,000 on an unsecured basis (i.e., the bank does not take a lien on collateral to secure repayment of the loan) and that the debtor agrees to repay the principal amount of the loan in installments over time (e.g., $2,000 in principal per month for fifty months). Suppose further that the debtor agrees to pay interest on the outstanding balance of the loan each month at an annual rate of 4%. Suppose finally that the debtor files for bankruptcy the day after taking out the loan, having made no principal or interest payments on the loan. Although the bank would not be entitled to recover any postpetition interest from the debtor, it would be entitled to an allowed claim for the entire $100,000 principal amount of its loan, even though the bank agreed that the debtor could repay the loan in installments over time. The bank would be entitled to an allowed

claim for $100,000 because that is what the Bankruptcy Code expressly provides. It would be absurd to suggest that the bank's claim had to be discounted to some lesser amount simply because the bank agreed that the debtor could repay the loan in installments.  Appellants are likewise entitled to an allowed claim for $95.5 million, representing the full, undiscounted principal amount of their Claims.

1.    **Appellants' Principal Claims constitute "claims" in the amount of $95.5 million under the plain text of section 101(5).**

The Supreme Court has repeatedly explained that, in construing the Bankruptcy Code, "[t]he starting point . . . is the existing statutory text." *Lamie v. United States Trustee*, 540 U.S. 526, 534 (2004); *see United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 241 (1989).  The Court has further explained that, "when the statute's language is plain, the sole function of the courts -- at least where the disposition required by the text is not absurd -- is to enforce it according to its terms." *Hartford Underwriters Ins. Co. v. Union Planters Bank*, 530 U.S. 1, 7 (2000); *see Connecticut Nat'l Bank v. Germain*, 503 U.S. 249, 253 (1992).  The governing provisions of the Bankruptcy Code are plain in their direction that Appellants hold a claim in the principal amount of $95.5 million.

Section 101(5) of the Code defines the term "claim" to mean any "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured." 11 U.S.C. § 101(5).  As the Supreme Court has made clear, this definition of the term "claim" is expansive.  *FCC v. NextWave Personal Communications, Inc.*, 537 U.S. 293, 302 (2003) ("claim" has "the broadest available definition" and includes "any right to payment"); *Cohen v. De La Cruz*, 523 U.S. 213, 218 (1998); *Johnson v. Home State Bank*, 501 U.S. 78, 83 (1991).

Similarly, the term "debt" is defined broadly as "liability on a claim." *Pennsylvania Dep't of Pub. Welfare v. Davenport*, 495 U.S. 552, 558 (1990) ("This definition reveals Congress' intent that the meanings of 'debt' and 'claim' be coextensive."). These definitions reflect "Congress' broad rather than restrictive view of the class of obligations that qualify as a 'claim' giving rise to a 'debt.'" *Id.* (citing H.R. Rep. No. 95-595, at 309 (1977), *reprinted in* 1978 U.S.C.C.A.N. 6266 (describing definition of "claim" as the "broadest possible" and noting that the Code "contemplates that all legal obligations of the debtor . . . will be able to be dealt with in the bankruptcy case").

Appellants clearly hold a $95.5 million "right to payment" against Oakwood under the Guarantees because, as the parties have stipulated, Oakwood is liable to Appellants for $95.5 million in principal shortfalls. Appellants' $95.5 million right to payment is "unsecured" because Appellants have not taken a lien on any collateral to secure Oakwood's payment obligation under its Guarantees, and Appellants' right to payment is "liquidated" and "fixed" because the parties have stipulated to the amount of the principal shortfalls that Oakwood owes under its Guarantees and Oakwood is obligated to pay these amounts. *Stillwater Nat'l Bank & Trust Co. v. Kirtley (In re Solomon)*, 299 B.R. 626, 639 n.55 (10th Cir. BAP 2003) ("[T]he Debtors unconditionally guaranteed the . . . debt and there was no evidence that the Bank would forego collection or enforcement from Debtors. In short, the Debtor's liability under the guaranty was not contingent."); *In re Southern Cinemas, Inc.*, 256 B.R. 520, 533-34 (Bankr. M.D. Fla. 2000).

Appellants' $95.5 million right to payment is legal in nature because it arises in contract (i.e., under the Guarantees), and is "disputed" because US Bank has objected to Appellants' Claims, asserting that the Principal Claims must be discounted. Finally, Appellants' right to payment is "unmatured," meaning that, as of the Petition Date, the amounts that Oakwood owed under its Guarantees were

not yet due (mature) because Oakwood was to pay them in the future as shortfalls arose. *In re Moffat*, 107 B.R. 255, 261 (Bankr. C.D. Cal. 1989) (an obligation "matures" when it "becomes due," or when "no further act of any kind was necessary" in order to trigger the obligation), *aff'd*, 119 B.R. 201 (9th Cir. BAP 1990), 959 F.2d 740 (9th Cir. 1992); BLACK'S LAW DICTIONARY (2d Pocket Ed.) (West 2001) (defining "mature" as "to become due").

Section 101(5) makes plain that a right to payment constitutes a "claim" regardless of whether it is matured or unmatured. Thus, even though, outside of bankruptcy, Oakwood would not have paid the principal shortfalls making up the principal amount of Appellants' Claims until they became due at different times in the future, Appellants' unmatured right to payment nevertheless constitutes a "claim" equal to the full amount of the Principal Claims because section 101(5) clearly includes any unmatured right to payment as part of the creditor's claim. Nothing in section 101(5) even remotely purports to discount the amount of a right to payment on the ground that it is unmatured. Thus, under section 101(5), Appellants hold a "claim" for unmatured principal in the amount of $95.5 million.

## 2.    Appellants' Principal Claims must be allowed in the full amount of $95.5 million under the plain text of section 502(b).

JPMorgan filed proofs of claim asserting Appellants' entitlement to the full amount of the Principal Claims. Pursuant to section 502(a), "[a] claim or interest, proof of which is filed under section 501 of this title, is deemed allowed, unless a party in interest . . . objects." Because US Bank objected to Appellants' Claims, the bankruptcy court was required to resolve the dispute pursuant to section 502(b).

Section 502(b) provides that, if an objection to a claim is filed, "the court . . . shall determine the amount of such claim . . . as of the date of the filing of the petition, and shall allow such claim in such amount, except to the extent that [one of the grounds for disallowance set forth in the balance of section 502(b)

applies]." It is undisputed that none of the grounds for disallowance set forth in the balance of section 502(b) applies to Appellants' Principal Claims. Accordingly, in cases such as this one, the bankruptcy court's task under section 502(b) is simple: to determine the amount of the claim as of the date the debtor filed its bankruptcy case. The amount of Appellants' Principal Claims as of the Petition Date is $95.5 million.

Significantly, section 502(b) does *not* say that the principal amount of a claim must be reduced to present value because it is unmatured -- i.e., due in installments in the future. On the contrary, section 502(b) plainly directs that the court must determine the amount of the "claim" as of the petition date -- meaning that it must establish the claim based on *what* the debtor owes, not *when* the obligation is due. This is necessarily so because, by the express terms of section 101(5), unmatured rights to payments are included in the definition of "claim" and nothing in section 502(b) strips from the claim any right to unmatured principal.

As numerous courts have recognized, the allowable amount of a debt for purposes of section 502 includes any undiscounted principal installments due in the future. This is because, under the Code's broad recognition of virtually every type of claim, the principal amount of the debt that may be due in the future is effectively accelerated by the debtor's bankruptcy filing, irrespective of any acceleration language in the parties' debt instrument. *Nationwide Mut. Ins. Co. v. Optel Inc. (In re Optel Inc.)*, No. 02-2121, 60 Fed. Appx. 390, 394, 2003 WL 1511376, *4 (3d Cir. March 25, 2003); *In re Payless Cashways, Inc.*, 287 B.R. 482, 488 (Bankr. W.D. Mo. 2002); *In re Auto Int'l Refrigeration*, 275 B.R. 789, 813 (Bankr. N.D. Tex. 2002); *In re Mitchell*, 85 B.R. 564, 566 (D. Nev. 1988); *In re Manville Forest Prods. Corp.*, 43 B.R. 293, 297 (Bankr. S.D.N.Y. 1984), *rev'd, in part, on other grounds*, 60 B.R. 403 (S.D.N.Y. 1986).

As one court has explained:

It is a basic tenet of the Bankruptcy Code that "[b]ankruptcy operates as the acceleration of the principal amount of all claims against the debtor." This tenet follows logically from the expansive Code definition of claim," which allows any claim to be asserted against the debtor, regardless of whether such claim is "reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed [or] undisputed . . . ." 11 U.S.C. § 101(4)(A), and from the Code's provision in Section 502 that a claim will be allowed in bankruptcy regardless of its contingent or unmatured status. Such contingent or unmatured claims may be asserted against the debtor despite the provisions of section 362(a)(6), which stays "any act to collect, assess, or recover a claim against the debtor that arose before the filing of the Chapter 11 petition." 11 U.S.C. § 362(a)(6).

Construing these code provisions together allows a creditor to file a claim for the full amount of an unmatured debt owed by the debtor despite the fact that the creditor is prevented, under Section 362 of the Code, from taking any steps to enforce that claim.

*Manville*, 43 B.R. at 297-98 (citations omitted) (quoted in *Optel*, No. 02-2121, 60 Fed. Appx. at 394).

In sum, under the plain terms of sections 101(5) and 502(b), Appellants are entitled to an allowed claim that includes the full, undiscounted amount of the principal shortfalls due under the Guarantees, notwithstanding that the principal amounts were unmatured on the Petition Date.

**3.    Section 502(b)'s instruction to determine the "amount" of a claim "as of the date of the filing of the petition" is simply an instruction to determine the debtor's liabilities as of the petition date and does not authorize the discounting of an obligation.**

The filing of a bankruptcy petition initiates an administrative process that requires some temporal point of demarcation in order to facilitate the orderly resolution of the debtor's obligations. As the Supreme Court has observed, the pivotal point for claims-allowance purposes is the petition date. *United States v. Marxen*, 307 U.S. 200, 207 (1939) ("the rights of creditors are fixed by the

Bankruptcy Act as of the filing of the petition in bankruptcy"); *Sexton v. Dreyfus*, 219 U.S. 339, 344-45 (1911).

By instructing courts to determine the amount of a claim "as of the date of the filing of the petition," section 502(b) simply prescribes a temporal point of demarcation and sets a baseline against which other provisions of the Code operate. For example, while debtors are often obligated to pay interest to creditors on their debt instruments, the longstanding general rule in bankruptcy is that "interest on the debtors' obligations ceases to accrue at the beginning of the proceedings." *Vanston Bondholders Protective Comm. v. Green*, 329 U.S. 156, 163 (1946). By setting the petition date as the point from which to determine the amount of a claim, section 502(b), operating in conjunction with section 502(b)(2), gives substance to this rule: Section 502(b) sets the petition date as the baseline reference for determining the amount of the claim and section 502(b)(2) disallows the claim to the extent that "such claim is for unmatured interest." H.R. Rep. No. 595, at 3352-54 (1977), *reprinted in* 1978 U.S.C.C.A.N. at 6308 ("Interest stops accruing at the date of the filing of the petition, because any claim for unmatured interest is disallowed under this paragraph."); *Texas Commerce Bank, N.A. v. Licht (In re Pengo Indus., Inc.)*, 962 F.2d 543, 546 (5th Cir. 1992) ("One established statutory rule is that the bankruptcy court must disallow any claim 'for unmatured interest.' This rule flows from the legal principle that 'interest stops accruing at the date of the filing of the petition.'") (citations omitted). Section 502(b)(2) does not itself prescribe the date from which interest is considered to be "unmatured" (and therefore not allowable) because section 502(b) sets the relevant baseline.

As a practical matter, unless section 502(b) prescribed the petition date as the point of demarcation, it would be unclear whether the amount of a claim should be determined from that date or from some other date. Moreover, section 502(b) directs the court to set the *amount* of a claim as of the petition date, not the claim's

*value*.  Indeed, section 502(b) says nothing at all about valuing a claim, discounting a claim, or anything remotely similar.  Section 502(b) should not be read to authorize more than what it actually prescribes.  *See Felix Frankfurter, Some Reflections on the Reading of Statutes*, 47 Colum. L. Rev. 527, 536 (1947) ("One must also listen attentively to what [the statute] does not say.").  The bankruptcy court erred in construing section 502(b) as a broader claims-adjustment mechanism than it actually is.

## B.    The Claims Orders Are Contrary To The Text And Structure Of The Bankruptcy Code As A Whole.

Congress adopted the original Bankruptcy Code in 1978 after ten years of study. *Ron Pair*, 489 U.S. at 240.  By design, the Code was intended to function as a coherent regulatory scheme.  Recognizing this, the Supreme Court has directed that the provisions of the Bankruptcy Code should be construed together, taking into account the relationships among the provisions and Congress's choice of language in drafting them. *United Sav. Ass'n v. Timbers of Inwood Forest Assocs., Ltd.*, 484 U.S. 365, 369-71 (1988) (construing sections 361, 362 and 506 of the Code and observing that "[s]tatutory construction is a holistic endeavor"); *Kelly v. Robinson*, 479 U.S. 36, 43 (1986) ("In expounding a statute, we must not be guided by a single sentence or member of a sentence, but look to the provisions of the whole law") (citations and internal quotations marks omitted); *Duparquet Huot & Moneuse Co. v. Evans*, 297 U.S. 216, 218 (1936).

### 1.    When Congress intends discounting under the Code, it uses language distinctly different from the text of section 502(b), and Congress did not intend section 502(b) to authorize discounting.

When Congress intends that an amount be discounted to present value, it says so expressly, directing the court to determine the "value" of the amount as of a particular point in time.  For example, in section 1325(a)(5)(B)(ii), Congress has

provided that, in considering the sufficiency of future distributions that a debtor proposes to make to a secured creditor under a Chapter 13 plan, the court must determine "the *value*, as of the effective date of the plan, of [the] property to be distributed under the plan." (Emphasis supplied). As the Supreme Court has explained, this text requires the court to "discount to present value" the stream of future payments proposed under the debtor's plan to ensure that it has a value that equals or exceeds the current value of the secured creditor's claim. *Till v. SCS Credit Corp.*, 541 U.S. 465, 468 (2004) (plurality) (section 1325(a)(5)(B)(ii) requires that the future stream of payments "must be calibrated to ensure that, over time, the creditor receives disbursements whose total present value equals or exceeds that of the allowed claim"); *Associates Commercial Corp. v. Rash*, 520 U.S. 953, 962 (1997); *Rake v. Wade*, 508 U.S. 464, 472 n.8 (1993); H.R. Rep. No. 95-595 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5963, 6364 (discussing the phrase "value, as of the effective date of the plan" and observing that the phrase "indicates that the promised payment under the plan must be discounted to present value as of the effective date of the plan").

In *Till*, the Supreme Court further explained that "the Bankruptcy Code includes numerous provisions that, like [section 1325(a)(5)(B)(ii)], require a court to 'discoun[t] . . . [a] stream of deferred payments back to the[ir] present dollar value.'" 541 U.S. at 474 (quoting *Rake*, 508 U.S. at 472 n.8). The Court listed them: "11 U.S.C. § 1129(a)(7)(A)(ii) . . .; §§ 1129(a)(7)(B), 1129(a)(9)(B)(i), 1129(a)(9)(C), 1129(b)(2)(A)[(i)(II)], 1129(b)(2)(B)(i), 1129(b)(2)(C)(i), 1173(a)(2), 1225(a)(4), 1225(a)(5)(B)(ii), 1228(b)(2), 1325(a)(4)." 541 U.S. at 474 n.10. Conspicuously absent from this list is section 502(b).

This is not surprising. In each of the provisions enumerated above, Congress has expressly directed the court to determine the "value" of some amount as of a particular date and, as noted, the term "value" as used in these provisions

means "present value." *Till*, 541 U.S. at 469 n.4. In contrast, section 502(b) says nothing about determining the "value" of a claim but merely directs the court to "determine the *amount* of [the creditor's] claim . . . as of the date of the filing of the petition." (Emphasis supplied); *see* 11 U.S.C. § 1129(a)(9)(A) ("amount"), § 1129(a)(9)(B)(ii) ("amount"). This choice of language is dispositive.

When Congress employs particular language in a provision of the Bankruptcy Code, it is presumed to act deliberately, and Congress's use of different terms in different provisions also is presumed to be deliberate. *NextWave*, 537 U.S. at 302 (provision appearing in one section of the Code, but not another, demonstrates that Congress did not intend the provision where it does not appear); *Davenport*, 495 U.S. at 560-61 (exception appearing in one section of the Code, but not another, demonstrates that Congress did not intend exception where it was not included); *see Bates v. United States*, 522 U.S. 23, 29-30 (1997) (it is "generally presumed that Congress acts intentionally" in the "disparate inclusion or exclusion" of particular language).

As discussed, Congress has directed in section 101(5) that a claim includes any and all unmatured installments of principal. If Congress had intended courts to reduce the unmatured principal amount of a claim by discounting the unmatured portion to present value, it would have directed the court to do so by determining the "value" of the claim. Conversely, the fact that Congress did not do so means that it did not intend courts to discount claims. *NextWave*, 537 U.S. at 302; *Toibb v. Radloff*, 501 U.S. 157, 162 (1991); *Johnson*, 501 U.S. at 87; *Davenport*, 495 U.S. at 560-61; *Ohio v. Kovacs*, 469 U.S. 274, 279 (1985); *NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 522-23 (1984).

**2.    The bankruptcy court's ruling that section 502(b) directs the discounting of claims renders section 502(b)(2) superfluous.**

The conclusion that section 502(b) does not authorize discounting is bolstered by the fact that engrafting a discounting requirement onto section 502(b) would violate a well-established canon of statutory construction by rendering superfluous another section of the very same provision. *Astoria Fed. Sav. & Loan Ass'n v. Solimino*, 501 U.S. 104, 112 (1991) ("[W]e construe statutes, where possible, so as to avoid rendering superfluous any parts thereof.")

As noted, section 502(b)(2) requires that a claim must be disallowed "to the extent that . . . such claim is for unmatured interest." *Vanston*, 329 U.S. at 163. The bankruptcy court disallowed the postpetition (unmatured) interest component of Appellants' Claims. But if section 502(b) itself required discounting, it would already eliminate a claim for postpetition (unmatured) interest because the very process of discounting to present value reduces a claim by an imputed rate of interest necessary to reflect the present value of payments due in the future. *St. Louis Southwestern R. Co. v. Dickerson*, 470 U.S. 409, 412 (1985) ("it is self-evident that a given sum of money in hand is worth more than the like sum of money payable in the future" and "the method of calculating present value should take into account . . . the rate of interest"). As one commentator has explained:

> The concept of present value is really quite simple and can be easily illustrated. Assume that A wants to borrow money from B, repayable at a future date. B is willing to make the loan, but feels that, considering the risks involved, he is entitled to a 10 percent annual rate of return. This being the case, how much money will he advance to A on A's note for $10 payable one year hence? The answer is $9.09, because the $10 paid next year provides interest of $.91, which is 10 percent of a $9.09 loan. Thus, $9.09 is the present value of $10 payable one year hence at a discount rate of 10 percent.

Sumner N. Levine, *Financial Analysts' Handbook I*, 140 (1975); *see Rake*, 508 U.S. at 472 n.8; 3 *The New Palgrave Dictionary of Money & Finance*, 172 (Peter

Newman et al. eds., 1992) (present value means "the summed discounted value of the stream of revenues which [an] asset generates" as to which "[t]he discount factor will be that determined by the interest rate over the relevant period").

By definition, then, the process of discounting a right to payment to present value eliminates any interest recovery because interest is the measure of the difference between the value of the future amount to be paid and the present value of the same amount. Accordingly, if section 502(b) directs the discounting to present value of unmatured payment obligations, section 502(b)(2) is unnecessary. As a matter of sound statutory construction, this Court should reject such "an interpretation of a congressional enactment which renders superfluous another portion of that same law." *Kawaauhau v. Geiger*, 523 U.S. 57, 62 (1998) (internal quotation marks and citation omitted).

**3.    The bankruptcy court's discounting rule would exact unfair penalties on creditors subject to other provisions of section 502(b), such as section 502(b)(6).**

The bankruptcy court's ruling that section 502(b) authorizes the discounting of claims also creates problems in the administration of other provisions of section 502(b), such as section 502(b)(6), which strictly limits the amount of a landlord's claim for lost future rent in cases in which the debtor rejects its lease. If the landlord's claim could also be discounted to present value, application of both the discounting feature of section 502(b) and the cap imposed by section 502(b)(6) would work a double-discounting penalty on the landlord. Courts have rightfully rejected this approach.

For example, in *Sunbeam-Oster Co. v. Lincoln Liberty Ave., Inc. (In re Allegheny Int'l, Inc.)*, 145 B.R. 823 (W.D. Pa. 1992), the district court affirmed the bankruptcy court's determination that a lease-rejection claim reduced by the cap imposed by section 502(b)(6) should not be discounted to present value, reasoning:

"It might make sense to discount a *total* claim to present value. However, the cap imposed by Section 502(b)(6) itself serves to limit the claim considerably." 145 B.R at 827 (emphasis supplied).

In this case, the bankruptcy court's determination that section 502(b) requires discounting is problematic, unworkable, and contrary to the text and structure of the Bankruptcy Code as a whole. Accordingly, the Court should reject the bankruptcy court's discounting analysis and reverse the Claims Orders.

## C.    The Claims Orders Are Contrary To The History Behind Section 502(b), The Legislative History To The Provision, And The Historical Treatment Of Guaranty Claims In Bankruptcy Cases.

The Supreme Court has explained that, "when Congress amends the bankruptcy laws, it does not write on a clean slate." *Dewsnup v. Timm*, 502 U.S. 410, 419 (1992) (internal quotation marks and citation omitted). Similarly, the Court has stated: "We . . . 'will not read the Bankruptcy Code to erode past bankruptcy practice absent a clear indication that Congress intended such a departure.'" *Cohen*, 523 U.S. at 221 (quoting *Davenport*, 495 U.S. at 563); *see United States v. Reorganized CF&I Fabricators of Utah, Inc.*, 518 U.S. 213, 221 (1996); *Midlantic Nat'l Bank v. New Jersey Dep't of Envtl. Prot.*, 474 U.S. 494, 500-02 (1986); *Duparquet*, 297 U.S. at 218 ("To fix the meaning of these provisions [of the Bankruptcy Act] there is need to keep in view the background of their history.").

Conversely, when Congress adopts a provision of the Bankruptcy Code that eliminates an authorization appearing under the prior law, it is presumed to have acted deliberately. *Lamie*, 540 U.S. at 538. Under the prior law, Congress did not authorize the discounting of the principal amount of an unmatured interest-bearing obligation, such as the B-2 Certificates, and courts properly refused to permit it. Moreover, when Congress enacted section 502(b), it clearly discontinued the only

type of discounting that its predecessor authorized -- the discounting of the principal amount of an unmatured *non*-interest-bearing debt. Finally, the current law retains the prior practice of permitting a creditor holding a guaranty claim to assert the full amount of its claim against the debtor's bankruptcy estate.

### 1.    The Claims Orders are contrary to prior practice under the predecessors to section 502.

The immediate statutory predecessor to section 502(b) was section 63 of the Bankruptcy Act of 1898, 11 U.S.C. § 103 (repealed 1979). In relevant part, section 63 provided:

> Debts of the bankrupt may be proved and allowed against his estate which are founded upon (1) a fixed liability, as evidenced by a judgment or an instrument in writing, absolutely owing at the time of the filing of the petition by or against him, whether then payable or not, with any interest thereon which would have been recoverable at that date or with a rebate of interest upon such as were not then payable and did not bear interest . . . .

Like section 502, section 63 set the petition date as the baseline reference for claims-allowance purposes. Furthermore, as section 63 made plain, a creditor was entitled to the principal amount of its claim "whether then payable or not," and was entitled to interest accrued "at the time of the filing." Section 63 also makes clear that the *only* exception to the full allowance of the principal amount of the debt was for *non*-interest-bearing obligations, as to which the section prescribed "a rebate of interest upon such as were not then payable *and did not bear interest*." (Emphasis supplied). 3A *Collier on Bankruptcy*, ¶ 63.16 at 1856-57 (14th ed. 1972) ("[Section 63] computes interest as of the day of the filing of the petition and stops it at that date, and this computation has been carried so far as to require a rebate of interest, presumably at the legal rate, on *non-interest-bearing debts* that have not matured when bankruptcy intervenes, for the reason that bankruptcy serves to accelerate the due date.") (emphasis supplied).

For example, in *In re New York Rys. Corp.*, 82 F.2d 739 (2d Cir. 1936), the debtor owed an unmatured principal obligation due many years in the future on an interest-bearing instrument.    Several parties objected to the amount of the creditor's claim on the ground that the principal was not due until far into the future and should be discounted to present value.    Rejecting this argument, the court observed: "To argue that this should be discounted is to ignore that statute (section 63 of the Bankruptcy Act, as amended (11 U.S.C.A. § 103) which provides for a 'rebate of interest upon such (debts) as were not then payable *and did not bear interest.*'" 82 F.2d at 742 (emphasis supplied).

Similarly, the predecessor to section 63, section 19 of the Act of 1867, provided in relevant part: "That all debts due and payable from the bankrupt at the time of the adjudication of bankruptcy, and all debts then existing but not payable until a future day, a rebate of interest being made when no interest is payable by the terms of the contract, may be proved against the estate of the bankrupt." Act of 1867, ch. 176, 14 Stat. 517 (1867) (repealed 1878).    As under section 63, courts interpreting section 19 limited its discounting feature to non-interest-bearing obligations.    *In re Orne*, 18 F. Cas. 10,581 (S.D.N.Y. 1867) (recognizing that section 19 required discounting for non-interest-bearing obligations, not interest-bearing debts).

When Congress enacted section 502(b), it did not alter the prior practice of refusing to discount the principal amount of an unmatured interest-bearing obligation.    On the contrary, Congress actually eliminated the only form of discounting that sections 63 and 19 permitted by refusing to reauthorize the discounting of unmatured non-interest-bearing debts in the statutory text.    That Congress retained the substance of sections 63 and 19 in so far as they establish the petition date as the baseline for claims-allowance purposes, but *eliminated* all reference to "rebates of interest" on unmatured *non*-interest bearing obligations,

demonstrates that Congress intended to eliminate what it did not retain. *Lamie*, 540 U.S. at 538.

> **2.     The Claims Orders contravene the legislative history to section 502(b).**

The conclusion that Congress intended to end any practice of discounting the principal amount of an unmatured obligation is confirmed by the legislative history to section 502(b). As explained in the House Report:

> Section 502(b) thus contains two principles of present law. First, interest stops accruing at the date of the filing of the petition, because any claim for unmatured interest is disallowed under this paragraph. Second, bankruptcy operates as the acceleration of the principal amount of all claims against the debtor. One unarticulated reason for this is that the discounting factor for claims after the commencement of the case is equivalent to the contractual interest rate on that claim. *Thus, this paragraph does not cause disallowance of claims that have not been discounted to a present value because of the irrebuttable presumption that the discounting rate and the contractual interest rate (even a zero interest rate) are equivalent.*

H.R. Rep. No. 595, at 3352-54 (1977), *reprinted in* 1978 U.S.C.C.A.N. at 6308 (emphasis supplied); *see* S. Rep. No. 989, at 62-5 (1978), *reprinted in* 1978 U.S.C.C.A.N. at 5848 (same). The foregoing passage demonstrates two things. First, Congress intended the automatic acceleration of the principal amount of all claims upon the petition date. Second, Congress did not intend that the principal amount of a claim be discounted. The bankruptcy court erred in concluding to the contrary.

> **3.     The Claims Orders contravene over a century of settled bankruptcy law concerning the treatment of guaranty claims.**

For well over a century, every federal court to have addressed the issue has adhered to a uniform rule:  a creditor holding a guaranty claim is entitled to assert the full amount of the claim against the bankrupt guarantor at the time the

guarantor commences its bankruptcy case.  Further, the creditor may assert the full amount of the claim without regard to any payments that the creditor receives or may receive from any other party also liable for the debt guaranteed by the guarantor.

For example, in *Board of Comm'rs v. Hurley*, 169 F. 92 (8th Cir. 1909), the creditor ("**County**") sought to recover a debt from two bankrupt obligors ("**Devlin**" and the "**Bank**").  The total amount of the obligation was $32,731.05.  The creditor recovered $26,839.46 from the Bank and Devlin claimed in his bankruptcy proceeding that the County's claim should be reduced by the $26,839.46 that the County had recovered from the Bank.  In other words, Devlin argued that the County's claim should be limited to $5,891.59, and that the County should be able to recover a distribution based only on its proportionate share of this lower figure.  In rejecting Devlin's argument, the court reasoned:

> [T]here vested in the county when the petition in bankruptcy was filed an equitable estate in such a portion of the property of Devlin as $32,731.05, the amount then owing by Devlin on its claim, bore to the amount of all the provable claims against his estate, and the county is entitled to the same proportion of the proceeds and dividends from that property until its claim is fully paid, because its equitable estate in this property is not diminished or changed by payments which it subsequently obtains upon its claim from other sources.

169 F. at 95-96 (citing *Merrill v. National Bank of Jacksonville*, 173 U.S. 131, 141 (1899)).  The court concluded its opinion with the following oft-quoted statement:

> The obligee on a bond, or the holder of a claim, upon which several parties are personally liable, may prove his claim against the estates of those who become bankrupt and may at the same time pursue the others at law, and, notwithstanding partial payment after the bankruptcy by other obligors or their estates, he may recover dividends from each estate in bankruptcy upon the full amount of his claim at the time the petition in bankruptcy was filed therein until from all sources he has received full payment of his claim . . . .

*Hurley*, 169 F. at 97.

The rule articulated in *Hurley* has been followed uniformly by the courts. *E.g., Ivanhoe Bldg. & Loan Ass'n v. Orr*, 295 U.S. 243, 245 (1935); *Security Nat'l Bank v. Gessin (In re Gessin)*, 668 F.2d 1105, 1107 (9th Cir. 1982) (rejecting argument by debtor that "in effect, seeks to have his guarantee treated as one that secures a fractional part of the total corporate debt" and "[t]hat . . . is not the nature of [his] liability."); *Ireton v. Lincoln Nat'l Bank*, 300 F. 316, 317-18 (6th Cir. 1924); *In re Realty Assocs. Sec. Corp.*, 66 F. Supp. 416, 424 (E.D.N.Y. 1946), *aff'd in part, mod. in part*, 163 F.2d 387 (1947); *In re F.W.D.C., Inc.*, 158 B.R. 523, 528 (Bankr. S.D. Fla. 1993).

The bankruptcy court's ruling requiring the discounting of Appellants' Principal Claims is contrary to these precedents. In essence, the bankruptcy court concluded that Appellants' Principal Claims had to be discounted to reflect the fact that Oakwood was obligated to pay principal shortfalls in the future, based on whether or not the Trusts made their required principal payments. But that is precisely the concept rejected by each of the cases cited above. Regardless of whether the guarantor may be obligated outside of bankruptcy to make payments in the future, or whether others may satisfy the underlying debt in part at some future date, the creditor is entitled to assert the ***full*** amount of the guaranteed obligation against the guarantor at the time the guarantor files for bankruptcy. Again, the concept is one of automatic acceleration. Once Oakwood commenced its bankruptcy case, Appellants became entitled to assert the full amount of Oakwood's liability under its Guarantees. Although phrased historically as a concept of "vesting," the import remains the same: the bankruptcy court is obligated to allow the full amount of Appellants' Principal Claims because these amounts were accelerated automatically as of the Petition Date.

**D.    The Bankruptcy Court Has No Authority To Create A Novel Claims-Adjustment Procedure By Directing The Discounting Of Appellants' Principal Claims.**

Courts lack "carte blanche to redraft statutes in an effort to achieve what Congress is perceived to have failed to do." *United States v. Locke*, 471 U.S. 84, 95 (1985). Moreover, although bankruptcy courts are certainly courts of equity, "[w]hatever equitable powers remain in the bankruptcy courts must and can only be exercised within the confines of the Bankruptcy Code." *Norwest Bank Worthington v. Ahlers*, 485 U.S. 197, 206 (1988); *see Grupo Mexicano de Desarrollo v. Alliance Bond Fund*, 527 U.S. 308, 332-33 (1999).

More specifically, the Supreme Court has restricted the ability of federal courts to establish categorically novel methods of treating claims under the Bankruptcy Code. *CF&I*, 518 U.S. at 228-29; *United States v. Noland*, 517 U.S. 535, 540 (1996). In *Noland*, the Sixth Circuit approved the categorical subordination of a tax penalty held by the United States. The court of appeals reasoned that, under principles of equitable subordination, the penalty claim should not be paid on par with other non-penalty claims, even though the United States had done nothing inequitable in pursuing the penalty. The Supreme Court reversed, concluding that federal courts do not have the authority to prescribe the categorical treatment of claims "at the same level at which Congress operated when it made its characteristically general judgment to establish the hierarchy of claims in the first place." 517 U.S. at 540; *see CF&I*, 518 U.S. at 228-29.

So too here, the bankruptcy court lacked the authority to engraft a discounting feature onto section 502(b) because doing so effectively eliminates any recovery for Appellants on the majority of their Principal Claims. It is for Congress, not the courts, to specify such a procedure. Because Congress has not

done so in section 502(b), the decision of the bankruptcy court discounting Appellants' Principal Claims must be reversed.

**E.    The Bankruptcy Court's Ruling Directing The Discounting Of Appellants' Principal Claims Is Contrary To The Fundamental Bankruptcy Policy Of Equality Of Distribution.**

As the Supreme Court has long recognized, an ancient policy underlying the Bankruptcy Code is the policy of equality of distribution among similarly situated creditors. *Union Bank v. Wolas*, 502 U.S. 151, 161 (1991) (noting "the prime bankruptcy policy of equality of distribution"); *Young v. Higbee*, 324 U.S. 204, 210 (1945) ("historically one of the prime purposes of the bankruptcy laws has been to bring about a ratable distribution among creditors of a bankrupt's assets"); *Chemical Bank v. First Trust (In re Southeast Banking Corp.)*, 156 F.3d 1114, 1118 (11th Cir. 1998) ("The overriding theme of bankruptcy law, both past and present, has been the equitable distribution of the debtor's remaining assets among creditors."). The bankruptcy court's discounting rule ensures that Appellants will not receive a ratable distribution but will instead receive far less than similarly situated claimants.

The process of allowing and paying claims in bankruptcy is designed to achieve finality, and one reason why the filing of a bankruptcy case operates as an automatic acceleration of all the debtor's outstanding indebtedness is to facilitate this process and enable all claims to be treated together and paid at a single point in time. To accomplish this, all of the debtor's liabilities are tallied and distributions are made ratably on allowed claims according to the availability of funds and each claim's relative payment priority. *Vanston*, 329 U.S. at 161 ("A purpose of bankruptcy is so to administer an estate as to bring about a ratable distribution of assets among the bankrupt's creditors.").

Obviously, a debtor may have many different kinds of debt obligations. For example, the debtor may be liable to a tort victim for an undetermined amount of damages that the victim has suffered; to a bank for an unmatured loan obligation; and to a tax collector for taxes payable in the future at the time a return is due. In determining the amount of the tort creditor's claim, the court would not discount to present value the principal amount of the claim simply because it may take a year or more to determine the amount of the damages through the completion of a judicial procedure. Where the damages have already been incurred, the amount of the damages forms the basis of the tort creditor's claim, regardless of the fact that the damages might not be paid until some point in the future at the conclusion of a lawsuit. Likewise, the bank would be entitled to assert a claim for the full principal balance of its loan and the tax collector would be entitled to assert a claim for the full amount of any taxes. Calculating claims in this way, without discounting based on when the claim might mature, fulfills both the command of section 502(b) and the policy of equality of distribution because it ensures that amounts owed as of the petition date will be treated the same, regardless of when payment on a particular claim might be due.

Appellants' Principal Claims have been unjustifiably reduced to an amount that is far less than the principal amount of Appellants' losses. As a result, Appellants face a distinct disadvantage as compared to other creditors who will receive distributions from Oakwood's bankruptcy estate based on the full, undiscounted principal balance of their claims. Because this result is obviously unequal, it violates the policy of equality of distribution.

## F.  The Bankruptcy Court's Construction Of Section 502(b) Burdens Unnecessarily The Administration Of Bankruptcy Cases.

A principal reason why bankruptcy law cuts off claims for unmatured interest after the debtor files for bankruptcy is to *avoid* the administrative burden of

calculating and recalculating claims based on the accrual of interest after the petition date. *Vanston*, 329 U.S. at 164 ("Accrual of simple interest on unsecured claims in bankruptcy was prohibited in order that the administrative inconvenience of continuous recomputations of interest causing recomputation of claims could be avoided."). The bankruptcy court's discounting rule is particularly anomalous in light of this administrative value because it requires the imposition of an even more complex administrative burden.

In order to discount Appellants' Principal Claims, the bankruptcy court had to determine an appropriate discount rate. Obviously, the Guarantees do not define contractually how to discount the *principal* amount of Appellants' Claims because this is not an ordinary commercial concept. Accordingly, the bankruptcy court was required to consider conflicting expert testimony on how this might be accomplished. The court's consideration of such conflicting expert testimony, however, is precisely the sort of administrative burden that bankruptcy law seeks to avoid. Indeed, bankruptcy law is particularly sensitive to such burdens, given the inherent lack of resources present in most bankruptcy cases and the fact that Congress intended bankruptcy administration to be expeditious and inexpensive. *Bildisco*, 465 U.S. at 517 n.1 (noting that Congress enacted Chapter 11 "with the intention that business reorganizations should be quicker and more efficient") (citing H.R. Rep. No. 95-595 at 5 (1977)). If Congress had intended that courts engage in the sort of expensive and complex discounting inquiry that the bankruptcy court conducted in this case, it would have authorized it. That Congress has not done so demonstrates that it is unwarranted.

### G.   The Bankruptcy Court's Discounting Rule Creates A Perverse Incentive For Guarantors To Escape Their Guaranty Obligations.

As noted by one court of appeals, it is important to consider whether any particular construction of section 502 promotes or discourages the avoidance of

bankruptcy proceedings. *LTV Corp. v. Valley Fid. Bank & Trust Co. (In re Chateaugay Corp.)*, 961 F.2d 378, 382 (2d Cir. 1992) ("we believe the bankruptcy court's logic [regarding discounting] ignores the importance of context, and does not make sense if one takes into account the strong bankruptcy policy in favor of speedy, inexpensive, negotiated resolution [of the debtor's financial problems short of commencing a bankruptcy case]"). The bankruptcy court's discounting rule is problematic precisely because it creates an incentive for financially troubled guarantors to commence bankruptcy proceedings to avoid their obligations, and conversely discourages them from attempting to resolve their guaranty obligations short of a bankruptcy filing.

The Claims Orders not only eliminate Appellants' claims for postpetition interest, they also strip Oakwood's $95.5 million principal obligation to a mere $25.3 million. The effect of this ruling is unmistakably to create a lure to the bankruptcy forum. Faced with the prospect of struggling to repay or renegotiate a $95.5 million obligation outside of bankruptcy or resolving the same debt at a fraction of this amount in a bankruptcy case, a troubled debtor would choose the latter option. This incentive is inappropriate. Just as the Second Circuit rejected a similar incentive in *Chateaugay*, this Court should do so here. *Cf. Taylor v. AGE Fed. Credit Union (In re Taylor)*, 3 F.3d 1512, 1516 (11th Cir. 1993) (a debtor is entitled to a fresh start, not a head start).

## H.  The Bankruptcy Court's Discounting Rule Is Inequitable And Generates A Windfall For Other Creditors Such As US Bank.

A longstanding policy of bankruptcy law is to prevent a party from receiving "a windfall merely by reason of the happenstance of bankruptcy." *Butner v. United States*, 440 U.S. 48, 55 (1979); *see Dewsnup*, 502 U.S. at 417-19. The bankruptcy court's ruling directing the discounting of Appellants' Principal Claims generates a windfall for other creditors precisely because the ruling inequitably

strips away the vast majority of Appellants' Principal Claims. As a result, Appellants are scheduled to receive recoveries based on claim amounts that reflect a small fraction of their actual losses, while other creditors will enjoy recoveries based on the full, undiscounted amount of their principal claims. This result is patently unfair and entirely unnecessary. Nothing in the Bankruptcy Code sanctions the bankruptcy court's discounting rule and this Court should reject it.

## I. The Bankruptcy Court's Prior Decision in *Loewen* Is Both Distinguishable And Inapposite.

The bankruptcy court did not explain in any written opinion the basis for its discounting rule. On appeal, however, the district court relied on the bankruptcy court's prior analysis in *In re Loewen Group Int'l, Inc.*, 274 B.R. 427 (Bankr. D. Del. 2002). The analysis in *Loewen*, however, is both distinguishable and in error.

First, in conducting its analysis in *Loewen*, the bankruptcy court did not address many of the arguments made here. For the reasons stated above, section 502(b) does not authorize the discounting of Appellants' Principal Claims. To the extent that *Loewen* holds otherwise, it should be overruled.

Second, *Loewen* is distinguishable because, in that case, the bankruptcy court conducted its discounting analysis under section 502(b) in the context of its evaluation of a series of *non*-interest-bearing notes. 274 B.R. at 430-31 (describing notes). As a result, the court did not address the problem of double discounting at issue in the present appeal. In contrast to the obligations in *Loewen*, the B-2 Certificates are interest-bearing. Because the bankruptcy court in this case *both* disallowed the postpetition interest component of Appellants' Claims *and* discounted the principal amount of the Claims, this matter squarely presents the problem of impermissible double discounting.

The presumption operating in *Loewen* and in other cases that "discount to present value" claims for *non*-interest-bearing principal is that the creditor gave the

debtor something of value commensurate with the value of the debtor's promise of future payment. For example, suppose a creditor agreed today to perform some service for the debtor and actually provided the service today. Suppose that, in exchange, the debtor promised to pay the creditor $10 a year hence without interest. The present value of the debtor's promise of future payment is $9.09 (assuming that the prevailing market rate of interest is 10%). Under such circumstances -- in which the value of the creditor's service is fixed by the value of the debtor's promise to pay, rather than by some outward indication of value, as would be the case if the creditor advanced $10 in cash -- discounting the creditor's claim to "present value" might make some sense (if, in fact, it were authorized under section 502(b), which it is not). Indeed, in *Loewen* the bankruptcy court recognized the benefit of the bargain concept as a factor justifying the discounting of non-interest bearing claims to present value. 274 B.R. at 440.

On the other hand, if the creditor actually loaned the debtor $10 in cash in exchange for the debtor's promise of future payment, or if the debtor's promise to pay included an additional obligation to pay interest, then the creditor's claim in bankruptcy would properly be $10 if the debtor filed for bankruptcy the day after making the promise because $10 is the amount of the creditor's capital outlay and discounting would not be appropriate. In this case, of course, Appellants advanced $95.5 million in exchange for the interest-bearing B-2 Certificates. Accordingly, the economic analysis applicable to non-interest-bearing, non-cash-loan indebtedness is simply irrelevant.

Third, in conducting its analysis in *Loewen*, the bankruptcy court relied on a series of cases that are also either distinguishable or inapposite. For example, the court relied on such cases as *PBGC v. Belfance (In re CSC Indus., Inc.)*, 232 F.3d 505, 508 (6th Cir. 2000), in which the Sixth Circuit considered a claim filed by the Pension Benefit Guaranty Corporation ("**PBGC**") for benefit payments that PBGC

would be making in the future. The critical difference between *CSC* and this case is that, at the time the debtor filed for bankruptcy in *CSC*, PBGC had not yet actually suffered a loss with respect to the benefit payments that it would be making at a future date. Here, however, Appellants made their advances well *before* Oakwood filed for bankruptcy. Accordingly, unlike PBGC in the *CSC* case, Appellants have already suffered losses in the form of their prepetition principal outlays. *See also PBGC v. CF&I Fabricators of Utah, Inc. (In re CF&I Fabricators of Utah, Inc.)*, 150 F.3d 1293, 1300 (10th Cir. 1998) (future benefits to be paid by PBGC); *Kucin v. Devan*, 251 B.R. 269, 273 (D. Md. 2000) (future retiree benefits); *LTV Steel Co. v. Aetna Cas. & Sur. Co. (In re Chateaugay Corp.)*, No. 94 CIV. 1257 (LMM), 1996 WL 346010, *1 (S.D.N.Y. June 24, 1996) (benefit payments made after petition date); *In re Thomson McKinnon Sec., Inc.*, 149 B.R. 61, 75-76 (Bankr. S.D.N.Y. 1992) (future retiree benefits).

Moreover, the question whether PBGC's claim in *CSC* should have been discounted under section 502(b) is a red herring because applicable non-bankruptcy law *already* requires the discounting of future-benefit claims where the future-benefit payments are to be recovered presently from the debtor. 29 U.S.C. § 1362(b)(1)(B); *Loewen*, 274 B.R. at 437 n. 22 ("it is true that ERISA contemplates the use of a discount factor in such situations"). Accordingly, PBGC's claim would be properly discounted, not under section 502(b), but under section 502(b)(1), which disallows a claim to the extent that it is unenforceable under applicable non-bankruptcy law.

The discounting of PBGC's claim for future-benefit payments in *CSC* also may be viewed as simply the equivalent of disallowing a claim for unmatured interest under section 502(b)(2). Because PBGC would not be making any payments out of its own funds until a future date, it would be able to earn interest

on its funds until such future date. In contrast, Appellants parted with their $95.5 million well before Oakwood filed for bankruptcy.

In *Loewen*, the bankruptcy court also relied on such cases as *In re O.P.M. Leasing Servs., Inc.,* 79 B.R. 161, 167 (S.D.N.Y. 1987), in which the court considered a claim for future damages suffered after the debtor filed for bankruptcy, arising from the postpetition rejection of a lease. The *O.P.M.* court treated the creditor's claim as one for losses that the creditor had not yet suffered at the time of the bankruptcy filing. Moreover, the claim in *O.P.M.* was not based on an interest-bearing obligation. Again, the context is plainly distinguishable, as Appellants were already out of pocket the full amount of their Principal Claims before the Petition Date and the B-2 Certificates are interest-bearing.

Finally, the bankruptcy court in *Loewen* relied on *Gas Power Mach. v. Wisconsin Trust Co. (In re Wisconsin Engine Co.),* 234 F. 281 (7th Cir. 1916), in which the court considered the treatment of claims based upon three *non*-interest bearing promissory notes. The terms of the notes provided that the indebtedness would be cancelled to the extent of the payment of certain royalties due in the future. 234 F. at 284. Critically, the court offered no discussion of the concept of discounting. *Wisconsin Engine* is thus both distinguishable and unilluminating.

In any event, the bankruptcy court's analysis in *Loewen* is not binding on this Court. For the reasons discussed above, the Court should reverse the decision of the bankruptcy court directing the discounting of Appellants' Principal Claims.

## J. The Claims Orders Are Not Supported By The Doctrine Of "Original Issue Discount."

As some courts have recognized, there are some instances in which a creditor may acquire a debt instrument, such as a promissory note, from the issuing debtor for less than the full face amount of the instrument. For example, the debtor may offer a note in the face amount of $1 million, bearing interest at the rate of 4

percent. If investors conclude that the interest rate is inadequate to compensate them for the risks associated with the note, they may offer to advance the debtor less than $1 million in exchange for the note; for example, an investor might advance $950,000 for the note. The reduced payment results in what is known as "original issue discount" ("**OID**") in the amount of $50,000.

Under section 502(b)(2), some courts treat OID as a form of unmatured interest. *Texas Commerce Bank, N.A. v. Licht (In re Pengo Indus., Inc.)*, 962 F.2d 543, 546 (5th Cir. 1992) ("The term 'unmatured interest,' which is not defined by the Bankruptcy Code, encompasses OID. The economic reality of [OID] bolsters this conclusion. For OID constitutes a method of providing for and collecting what in economic fact is interest to be paid to compensate for the delay and risk involved in the ultimate repayment of monies loaned.") (internal quotation marks and citations omitted). Accordingly, the creditor who pays $950,000 for a $1 million interest-bearing note and then files a claim for $1 million after the debtor files for bankruptcy may have its claim reduced to reflect the unearned portion of the discount. The legislative history to section 502 explains this rule:

> Interest disallowed under this paragraph [section 502(b)(2)] includes postpetition interest that is not yet due and payable, and any portion of prepaid interest that represents an original discounting of the claim, yet that would not have been earned on the date of the bankruptcy. For example, a claim on a $1,000 note issued the day before bankruptcy would only be allowed to the extent of the cash actually advanced. If the original issue discount was 10% so that the cash advanced was only $900, then notwithstanding the face amount of the note, only $900 would be allowed. If $900 were advanced under the note some time before the bankruptcy, the interest component of the note would have to be pro-rated and disallowed to the extent it was for interest after the commencement of the case.

H.R. Rep. No. 595, at 352-54 (1977), *reprinted in* 1978 U.S.C.C.A.N. at 6308; S. Rep. No. 989, at 62-5 (1978), *reprinted in* 1978 U.S.C.C.A.N. at 5848; *see Pengo*, 962 F.2d at 546-47.

The purpose of the OID rule is to prevent a creditor from recovering a claim in excess of the amount that the creditor actually advanced to the debtor, to the detriment of other creditors. *Pengo*, 962 F.2d at 546. Appellants advanced $95.5 million to acquire their B-2 Certificates, which have a face amount of $98.7 million. Accordingly, Appellants did not advance the full face amount of the certificates. Nevertheless, Appellee did not pursue an objection to Appellants' Claims on this ground and thus cannot do so now.[4]

Even if this were not the case, however, the bankruptcy court's ruling discounting Appellants' Principal Claims to $25.3 million cannot be justified under the OID rule because the discounting leaves Appellants with a claim that is far *less* than what they paid for their B-2 Certificates. Not only is this unwarranted under the OID rule, it is unauthorized by section 502(b).

## CONCLUSION

For the foregoing reasons, Appellants respectfully request that the Court (1) reverse the district court's Order affirming the bankruptcy court's Claims Orders; (2) instruct the district court to reverse the Claims Orders directing the discounting of Appellants' Principal Claims; (3) direct the district court to instruct the bankruptcy court to allow Appellants' Principal Claims in full.

---

[4]In addition, Appellants acquired their B-2 certificates from an underwriter who, in turn, acquired the certificates from OMI which, in turn, acquired them from the Trusts for their full face value. Appellants are thus the assignees of an entity that paid for the certificates in full and, accordingly, the OID rule does not apply. See *Pengo*, 962 F.2d at 546 (explaining that OID results when a debt instrument is issued for less than its face value).

Dated:  June 20, 2005                Respectfully submitted,


G. Eric Brunstad, Jr.
  *Counsel of Record*
BINGHAM McCUTCHEN LLP
One State Street
Hartford, CT  06103
(860) 240-2700

Timothy B. DeSieno
BINGHAM McCUTCHEN LLP
399 Park Avenue
New York, NY 10022
(212) 705-7000

Rheba Rutkowski
BINGHAM McCUTCHEN LLP
150 Federal Street
Boston, MA 02110
(617) 951-8000


Russell C. Silberglied
Jason M. Madron
RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
Wilmington, DE 19899
(302) 651-7545

M. William Munno
John J. Galban
SEWARD & KISSEL LLP
One Battery Park Plaza
New York, New York 10004
(212) 574-1200
(solely as counsel for JPMorgan)

Christopher D. Loizides
LOIZIDES & ASSOCIATES
1225 King Street, Suite 800
Wilmington, DE 19801
(302) 654-0248

Robert C. Goodrich, Jr.
STITES & HARBISON, PLLC
SunTrust Center, Suite 1800
424 Church Street
Nashville, TN 37219
(615) 244-5200

Alex P. Herrington, Jr.
STITES & HARBISON, PLLC
400 West Market Street, Suite 1800
Louisville, Kentucky 40202
(502) 587-3400

*Counsel to Appellants*

### Certificate of Compliance Under Fed. R. App. 32(a)(7)

I, Rheba Rutkowski, hereby certify that, based upon the word and line count of the word processing system used to prepare this brief, the brief contains 13,816 words.

_Rheba Rutkowski/ap_
_____
Rheba Rutkowski

### Certificate of Membership Under Local Rule 28.3(d)

I, Jason Madron, hereby certify that G. Eric Brunstad, Jr., Timothy B. DeSieno, Rheba Rutkowski, Robert C. Goodrich, Jr., Madison L. Cashman, John J. Galban, Russell C. Silberglied, and Christopher Loizides and I are all members of the bar of this Court.

_Jason M. Madron_
_____
Jason M. Madron

No. 05-2032, 05-2033, 05-2034 (Consolidated)

# In the
# United States Court of Appeals
### *for the*
# Third Circuit

In re OAKWOOD HOMES CORPORATION *et al.*

*Debtors.*

JPMORGAN CHASE BANK, TRUSTEE (No. 05-2033),
AND APPEALING B-2 HOLDERS JEFFERSON PILOT CORPORATION,
TYNDALL PARTNERS, LP, TYNDALL INSTITUTIONAL PARTNERS, LP (No.
05-2032), ACADEMY LIFE INSURANCE COMPANY, LIFE INVESTORS
INSURANCE COMPANY OF AMERICA, MONUMENTAL LIFE INSURANCE
COMPANY, PEOPLE'S BENEFIT LIFE INSURANCE COMPANY, AND
TRANSAMERICA LIFE INSURANCE COMPANY (No. 05-2034),

*Appellants,*

-against-

U.S. BANK NATIONAL ASSOCIATION,

*Appellee.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF DELAWARE

### CERTIFICATE OF SERVICE

I, Jason M. Madron, Esquire, hereby certify that on this 20th day of June, 2005, I caused

a true and correct copy of the foregoing Brief of Appellants and accompanying documents to be

served on all counsel in the manner indicated below;

Jason M. Madron

## Service List for Oakwood Homes Corporation,
### Third Circuit Court of Appeals, Appeal Nos. 05-2032, 05-2033, 05-2034

*Via Hand Delivery and Electronic Mail:*

    Karen C. Bifferato, Esquire
    Christina Thompson, Esquire
    Marc J. Phillips, Esquire
    Connolly Bove Lodge & Hutz LLP
    The Nemours Building
    1007 North Orange Street
    P.O. Box 2207
    Wilmington, Delaware 19899
    E-Mail: kcb@cblhlaw.com
           cthompson@cblh.com
           mphillips@cblh.com

    Derek C. Abbott, Esquire
    Robert J. Dehney, Esquire
    Morris, Nichols, Arsht & Tunnell
    1201 N. Market Street
    P. O. Box 1347
    Wilmington, Delaware 19899
    E-Mail:dabbott@mnat.com
          rdehney@mnat.com

*Via Federal Express and Electronic Mail:*

    Michael B. Fisco, Esquire
    Abby E. Wilkinson, Esquire
    Faegre & Benson LLP
    2200 Wells Fargo Center
    90 South Seventh Street
    Minneapolis, Minnesota 55402-3901
    E-Mail: MFisco@faegre.com
    E-Mail: AWilkinson@faegre.com

    Robert Stark, Esquire
    Brown Rudnick Berlack Israels LLP
    120 West 45th Street
    New York, New York 10036
    E-Mail: rstark@brownrudnick.com

*Via Hand Delivery:*

    William F. Taylor, Jr., Esquire
    McCarter & English, LLP
    919 Market Street, Suite 1800
    P. O. Box 111
    Wilmington, Delaware 19801

    Mark S. Kenney, Esquire
    Office of the United States
    Trustee
    844 King Street
    Lockbox 2313
    Wilmington, Delaware 19801

    Laurie Selber Silverstein, Esquire
    Potter Anderson & Corroon LLP
    1313 N. Market Street, 6th Floor
    Wilmington, Delaware 19801

    Eric Lopez Schnabel, Esquire
    Klett Rooney Lieber & Schorling
    1000 West Street
    Suite 1410
    Wilmington, Delaware 19801

    Christopher D. Loizides, Esquire
    Loizides & Associates
    1225 King Street, Suite 800
    Wilmington, Delaware 19801

*Via Federal Express:*

    John J. Galban, Esquire
    M. William Munno, Esquire
    Seward & Kissel LLP
    One Battery Park Plaza
    New York, New York 10004

*Via Federal Express:*

Rheba Rutkowski, Esquire
Bingham McCutchen LLP
150 Federal Street
Boston, Massachusetts 02110

Michael J. Reilly, Esquire
Anna M. Boelitz, Esquire
Michael C. D'Agostino, Esquire
Bingham McCutchen LLP
One State Street
Hartford, Connecticut 06103

Steven G. Varner, Esquire
Alvarez & Marsal
633 West 5th Street
Suite 2560
Los Angeles, California 90071

Robert C. Goodrich, Jr., Esquire
Alex P. Herrington, Jr., Esquire
Stites & Harbison, PLLC
SunTrust Center, Suite 1800
424 Church Street
Nashville, Tennessee 37219-2376

Peter Partee, Esquire
Hunton & Williams
Riverfront Plaza, East Tower
951 East Byrd Street
Richmond, Virginia 23219-4074